UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**JUDGE BAER**

| Georg F.W. Schaeffler, INA-Holding Schaeffler GmbH & Co. KG, Schaeffler Holding GmbH & Co. KG, and Schaeffler Holding, LP, | |
|---|---|
| Petitioners, | |
| - v- | |
| UNITED STATES OF AMERICA, | |
| Respondent. | |

**13 CV 4864**

Index No. _____

RECEIVED
JUL 1 2 2013
U.S.D.C. S.D. N.Y.
CASHIERS

### PETITION TO QUASH
### INTERNAL REVENUE SERVICE SUMMONS

Petitioners Georg F.W. Schaeffler, INA-Holding Schaeffler GmbH & Co. KG, Schaeffler Holding GmbH & Co. KG, and Schaeffler Holding, LP (collectively, "Petitioners" or "Schaeffler") hereby file this Petition to quash the Internal Revenue Service's ("IRS") administrative summons (the "Summons") issued to Ernst & Young ("EY") because it seeks "legal opinions" and other confidential advice that are protected from disclosure by both the work product doctrine and the attorney-client privilege, as extended to EY pursuant to the tax practitioner privilege of 26 U.S.C. § 7525.[1]  A true and correct copy of the Summons has been attached as Exhibit A.  Petitioners state as follows:

### I.   PARTIES

1.      Petitioner Georg F.W. Schaeffler is a U.S. taxpayer who resides in Dallas, Texas. Petitioner INA-Holding Schaeffler GmbH & Co. KG is a German limited partnership classified

---

[1] Attorney-client privilege and tax practitioner privilege are coextensive for purposes of this petition and are referred to collectively as "attorney-client privilege" or "privilege" herein.

as a partnership for U.S. tax purposes, with a principal place of business at Industriestraße 1-3, 91074 Herzogenaurach, Germany. Petitioner Schaeffler Holding GmbH & Co. KG is a German limited partnership classified as a partnership for U.S. tax purposes, with a principal place of business at Industriestraße 1-3, 91074 Herzogenaurach, Germany. Petitioner Schaeffler Holding, LP is a limited partnership disregarded for U.S. tax purposes, with a principal place of business in Dallas, Texas.

2.      Respondent is the United States of America, acting through its agency, the Internal Revenue Service. Respondent will be served pursuant to 26 U.S.C. § 7609(b)(2)(B) by sending a copy by certified mail to Paul Doerr, Internal Revenue Service, Stop 5656 PD, 4330 Watt Avenue, Sacramento, California, 95821, and by serving the United States of America pursuant to Fed. R. Civ. P. 4(i).

3.      The third-party summons was issued to EY, Schaeffler's tax advisers. EY will be served pursuant to 26 U.S.C. § 7609(b)(2)(B) by sending a copy of this Petition by certified mail to its headquarters at 5 Times Square, New York, New York 10036-6530, and to its 2901 Douglas Blvd., Suite 300, Roseville, California 95661 location.

## II.      JURISDICTION AND VENUE

4.      On June 25, 2013, the IRS, through its agent Revenue Agent Paul Doerr, issued the Summons in connection with the IRS examinations of Schaeffler's federal income tax returns for the taxable years 2009 and 2010. The Summons was delivered to an EY location at 2901 Douglas Blvd., Suite 300, Roseville, California 95661.

5.      This proceeding is brought pursuant to 26 U.S.C. § 7609(b)(2) to quash the Summons served by Respondent through its agent, Revenue Agent Paul Doerr of the IRS, on EY, which is a third-party record keeper. A petition to quash an IRS summons issued to a third-

party must be brought where the summons recipient "resides or is found." 26 U.S.C. § 7609(h)(1). EY resides and is found in this district. EY's national and global headquarters is at 5 Times Square, New York, New York, 10036-6530. This is also EY's international headquarters, the location where the relevant services and communications occurred, and where the requested documents are located. Accordingly, jurisdiction and venue are proper before this Court.

6.     This Petition was filed within the twenty (20) day time period of 26 U.S.C. § 7609(b)(2)(A) and is timely.

### III.    **GROUNDS FOR RELIEF**

7.     The Court should quash the Summons in its entirety because, on its face, it seeks confidential legal opinions, analysis, and other advice that is protected by the work product doctrine and attorney-client privilege and is not discoverable. Specifically, the IRS demands production of:

> all documents created by [EY], including but not limited to **legal opinions, analysis** and **appraisals**, that were provided to parties outside the Schaeffler Group, that relate to (1) the debt restructuring of Schaeffler Group's approximately €11 billion debt for the purchase of Continental AG or (2) the restructuring of the Schaeffler entities in conjunction with the debt restructuring.

(Ex. A) (emphasis in original).

8.     Schaeffler has previously invoked all privileges and protections that exist under U.S. law in response to an Information Document Request ("IDR") made by the IRS directly to Schaeffler that requested "all tax opinions received impacting any tax return under examination," which implicated the documents at issue. (Declaration of Todd Welty, attached as <u>Exhibit 1</u> ("Welty Decl.") ¶ 13.) The restriction of the Summons to only those documents that were shared

*outside* the Schaeffler Group is informative in that it implies both acquiescence to Schaeffler's initial assertion of privilege and reliance by the IRS on a theory that those protections have somehow been waived. As discussed herein, the sought after tax advice requested by the Summons is protected by the work product doctrine and attorney-client privilege, and Schaeffler has handled this privileged and protected material in a manner that is consistent with maintaining those underlying protections. Therefore, the Court should quash the Summons in its entirety.

9.     Schaeffler engaged EY after it recognized the likelihood of significant U.S. tax consequences and litigation as the result of an unexpectedly large stock acquisition during the 2008 global financial collapse that necessitated a complex refinancing and corporate restructuring. The documents at issue are core opinion work product that would not have been created in the form in which they now exist but for the prospect of an IRS audit and possible litigation.

10.    Since EY created the documents that the IRS seeks in anticipation of litigation, the IRS must argue that Schaeffler waived work product protection by disclosing these documents to third-parties. However, sharing work product does not automatically destroy work product protection. The protection is only lost if a party voluntarily discloses the protected material to an adversary or an avenue to a potential adversary. Here, Schaeffler recognized the importance of maintaining work product protection and restricted the disclosure of the EY tax advice to only: (1) Schaeffler's outside counsel (Dentons or other law firms) and (2) a consortium of banks (the "Bank Consortium") of Schaeffler and their legal advisors who received materials pursuant to a common legal interest and confidentiality agreement with Schaeffler. Those disclosures did not make it likely that the documents would be revealed to an adversary of Schaeffler. Therefore, the work product protection was not waived.

11.     The requested documents contained tax advice, analysis, and legal opinions, and, by definition, were subject to the attorney-client privilege.  As with the work product doctrine, the IRS's only available option is to argue that this privilege was waived by Schaeffler, the privilege holder.  Again, it was not.  First, documents shared with Schaeffler's attorneys remained privileged because communications between two "attorneys" (Dentons as a law firm and EY as federally authorized tax practitioners with attorney-client privilege pursuant to 26 U.S.C. § 7525) for the benefit of the same client (Schaeffler) remain privileged.  Second, documents shared with the Bank Consortium remained privileged because the documents were shared pursuant to Schaeffler and the Bank Consortium's common legal interest in accurately analyzing the tax consequences and assessing the appropriate legal tax positions of the transactions in which they were engaging.

12.     Since all original privileges and protections remain intact, the documents the IRS seeks are not discoverable and the Court should quash the IRS's Summons in its entirety.

## IV.     FACTUAL BACKGROUND

### A.  Schaeffler Recognized The Risk Of Litigation With The IRS And Sought Professional Advice

13.     During the 2008 economic crisis, Schaeffler, an automotive and industrial parts manufacturer and distributor, acquired a far greater-than-expected share of Continental AG ("Conti"), another automotive and industrial parts supplier.  Consequently, Schaeffler incurred an €11 billion debt that necessitated substantial corporate restructuring and refinancing.  Because Schaeffler immediately anticipated that such major restructuring and refinancing would result in significant U.S. tax consequences and litigation, it sought advice from lawyers and tax practitioners.

5

14.    Schaeffler's circumstances resulted from unfortunate timing.  Schaeffler wanted to acquire a minority interest in Conti through a stock acquisition.  (Declaration of Georg F.W. Schaeffler, attached as Exhibit B ("Schaeffler Decl.") ¶ 6.)  German law prohibits partial tender offers, so the offer price per share was set at a value estimated to generate the desired acceptance rate of the tender offer.  (Schaeffler Decl. ¶ 6.)  Unfortunately, on September 14, 2008—two days before the acceptance period closed—Lehman Brothers Holding Inc.'s bankruptcy became public and the stock market collapsed.  (Schaeffler Decl. ¶ 6.)  German law prohibited Schaeffler from withdrawing the offer, and a greater than expected percentage of Conti shareholders ultimately accepted.  (Schaeffler Decl. ¶ 6.)  As a result, Schaeffler became the owner of nearly 89.9% of outstanding Conti shares.  (Schaeffler Decl. ¶ 6.)  Worse still, Conti's market value significantly decreased between the close of the acceptance period and finalization of the share transfers; Schaeffler's debt financed offer price was €70-75 per share and the market value of the shares at finalization was €30 per share.  (Schaeffler Decl. ¶ 6.)  The financial downturn, coupled with the acquisition of a far greater interest in Conti than intended (resulting in far more debt than anticipated), presented significant challenges and created an immediate need to refinance the Conti acquisition debt and restructure Schaeffler.  (Schaeffler Decl. ¶ 7; Declaration of Klaus Rosenfeld, attached as Exhibit C ("Rosenfeld Decl.") ¶ 5.)  At the entity level, the restructuring principally involved INA-Holding Schaeffler GmbH & Co. KG ("IHO") subsidiaries.  But because IHO is treated as a partnership for U.S. tax purposes and Mr. Schaeffler is its 80% owner, the tax consequences of the refinancing and restructuring flow through to Mr. Schaeffler's personal U.S. tax returns.  (Schaeffler Decl. ¶ 8.)

15.    Schaeffler immediately recognized that its sudden majority ownership interest in Conti (a non-U.S. corporation) and the necessary refinancing and restructuring would have

significant U.S. tax consequences and draw IRS scrutiny. (Schaeffler Decl. ¶ 8; *see also* Rosenfeld Decl. ¶ 6; Declaration of Marc Teitelbaum, attached as Exhibit H ("Teitelbaum Decl.") ¶¶ 4-6.) Additionally, Mr. Schaeffler had recent personal contact with the IRS prior to the Conti transaction. Thus, based on both his knowledge of the law and his own personal experience, Mr. Schaeffler recognized that IRS scrutiny and even litigation was likely when Schaeffler sought professional advice from Dentons and EY. (Schaeffler Decl. ¶ 10.)

### B. Schaeffler Received Legal And Tax Advice From Dentons And EY

16.    In 2008, Schaeffler engaged Dentons to provide U.S. tax advice regarding the Conti stock acquisition and any necessary refinancing or restructuring steps required to resolve the issues created by the acquisition. (Teitelbaum Decl. ¶ 5.)[2] The U.S. legal and tax issues were large, esoteric, and extremely complex both from a substantive standpoint, and due to the sheer number of moving parts that had to be suitably meshed with each other. The issues included controlled foreign corporation ("CFC") principles; significant troubled company issues; German bank regulatory issues; German creditor rights, securities, and merger and acquisition laws; and differences between U.S. and German legal forms and tax law. (Teitelbaum Decl. ¶ 6.)

17.    Dentons provided Schaeffler with U.S. tax and legal advice—in both oral and written form—to help Schaeffler evaluate the likely tax consequences of the refinancing and restructuring, assess the arguments the IRS would likely make in any dispute of Schaeffler's tax treatment of the transactions, and weigh the potential risks Schaeffler would face if the tax consequences of the transactions were litigated or otherwise challenged by the IRS. (Teitelbaum

---

[2]    Schaeffler also engaged Allen & Overy to advise on corporate law issues implicated by the proposed 2009 and 2010 refinancing and restructuring. (Schaeffler Decl. ¶ 11.)

Decl. ¶ 12.)  Communications between Dentons and Schaeffler were made in confidence as part of their attorney-client relationship.  (Teitelbaum Decl. ¶ 12.)

18.   In November 2008, EY also began providing professional tax advice to Schaeffler on the various U.S. tax implications of the Schaeffler Group's proposed refinancing and restructuring necessitated by the Conti acquisition.  (Declaration of John Martinkat, attached as Exhibit F ("Martinkat Decl.") ¶ 3.)  Specifically, "EY prepared tax memoranda and other tax analysis that identified potential U.S. tax consequences of the refinancing and restructuring and identified and analyzed possible IRS challenges to Schaeffler's tax treatment of the transactions at issue." (Martinkat Decl. ¶ 4.)  For example, EY memorialized key tax advice and analysis in a several-hundred-page memorandum (the "EY Tax Memo").  (Martinkat Decl. ¶ 8.)  The EY Tax Memo contains EY's analysis and advice concerning the U.S. federal tax treatment of various aspects of Schaeffler's 2009 and 2010 restructuring and refinancing, including an analysis of possible challenges by the IRS.  (Martinkat Decl. ¶ 8.)  Specifically, the EY Tax Memo analyzes numerous legal issues, cases, and tax authorities; discusses theories the IRS may advance to challenge the transactions; notes the strengths and weaknesses of Schaeffler's tax and legal positions; and provides EY's opinion of the risks and probable outcome of litigation or other adversarial proceedings against the IRS in relation to the 2009 and 2010 refinancing and reorganization. (Teitelbaum Decl. ¶ 23; *see also* Martinkat Decl. ¶ 8; Rosenfeld Decl. ¶ 14; Schaeffler Decl. ¶ 23.)

### C.  Schaeffler And The Consortium Of Banks Aligned Their Interests And Formed A Common Strategy for Potential Litigation

19.   An €11 billion loan from the Bank Consortium was Schaeffler's primary source of funds for the Conti stock acquisition.  (Schaeffler Decl. ¶ 7; Rosenfeld Decl. ¶ 5.)  Like

Schaeffler, the Bank Consortium and their legal advisors recognized the extreme size, novelty, and complexity of the U.S. tax implications created by the necessary refinancing of the acquisition debt and corporate restructuring. (Schaeffler Decl. ¶¶ 7, 12; Declaration of Steven Land, attached as Exhibit G ("Land Decl.") ¶¶ 5-6; Teitelbaum Decl. ¶¶ 5-6; Martinkat Decl. ¶ 3.) The Bank Consortium also recognized the certainty of an IRS audit and litigation. (Schaeffler Decl. ¶¶ 7, 12; Land Decl. ¶¶ 5-6; Teitelbaum Decl. ¶¶ 5-6; Martinkat Decl. ¶ 3.) The parties anticipated tax audits, investigations, and the good-faith challenge by Schaeffler of any proposed tax adjustments from the IRS. (Schaeffler Decl. ¶ 14; Teitelbaum Decl. ¶ 20; Land Decl. ¶ 7.)

20.     The Bank Consortium fully aligned its interests with those of Schaeffler with respect to the tax treatment of the refinancing and restructuring and agreed to effectively subordinate its claims for repayment of the debt to the payment of Mr. Schaeffler's tax liabilities, including U.S. taxes. (Schaeffler Decl. ¶¶ 12-14, 19-20; Teitelbaum Decl. ¶¶ 15-17; Land Decl. ¶¶ 4-6.) This agreement provided that, prior to the repayment of the Conti acquisition debt, Schaeffler's cash flow—within certain limits—would be used first to pay Mr. Schaeffler's personal taxes, up to approximately €885 million. (Schaeffler Decl. ¶ 14; Teitelbaum Decl. ¶ 18; Land Decl. ¶ 6.) The Bank Consortium further agreed to an extension of an additional line of credit to pay Mr. Schaeffler's tax liabilities. (Teitelbaum Decl. ¶ 19.) Since the Bank Consortium agreed to prioritize Schaeffler's annual cash flow towards Mr. Schaeffler's taxes, Schaeffler reciprocally agreed to notify the Bank Consortium of a material audit and permit the Bank Consortium the opportunity to advise on any proposed action before proceeding. (Schaeffler Decl. ¶ 14; Teitelbaum Decl. ¶ 20; Land Decl. ¶ 7.)

21.    The parties agreed to pursue a common plan to achieve tax compliance and reporting certainty, minimize large IRS audit adjustments, evaluate potential IRS audit outcomes, and prepare to contest in good faith any proposed tax adjustment.  (Schaeffler Decl. ¶¶ 12, 20; Teitelbaum Decl. ¶ 21; Land Decl. ¶ 7.)  To that end, they needed to share confidential tax information and advice.  (Schaeffler Decl. ¶ 14; Land Decl. ¶ 7.)

22.    The parties contemporaneously memorialized these common legal interests into an agreement (referred to among the parties as the "ACP [Attorney Client Privilege] Agreement") whereby the parties recognized the privileged nature of the information and agreed to take all measures necessary to maintain the confidentiality and privileges of any material shared pursuant to these common legal interests.  (Schaeffler Decl. ¶¶ 14, 21-22; Teitelbaum Decl. ¶¶ 20-22; Land Decl. ¶¶ 7-8.)  Each party executed formal written agreements documenting their understanding.  (Schaeffler Decl. ¶ 22; Teitelbaum Decl. ¶ 21; Land Decl. ¶ 8.)  The parties understood they were legally obligated to maintain the confidentiality of the shared material, and to the best of Schaeffler, Dentons, and the Bank Consortium's belief and understanding, confidentiality has been maintained through the present.  (Schaeffler Decl. ¶ 22; Teitelbaum Decl. ¶ 25; Land Decl. ¶ 8.)  Pursuant to the agreements, the Bank Consortium was provided access to key EY tax analyses, including the EY Tax Memo, regarding the U.S. tax consequences of the refinancing and restructuring.  The EY material contained detailed analysis of EY's theories and opinions about the proposed transactions, the strengths and weaknesses of Schaeffler's tax and legal positions, and the risk and probable outcome of a dispute with the IRS.  (Schaeffler Decl. ¶ 23; Teitelbaum Decl. ¶¶ 23-24; Land Decl. ¶ 8.)  Absent the shared common legal interest and the Bank Consortiums agreement to maintain the privileged and confidential

status of any received material, Schaeffler would not have provided the Bank Consortium access to the EY tax advice. (Schaeffler Decl. ¶ 24.)

### D. The IRS's Attempts to Obtain Schaeffler's Privileged Documents

23.     From the onset of the current examination, the IRS has demanded the production of privileged and protected documents. (Welty Decl. ¶ 12.) Schaeffler has complied with requests for non-privileged information needed for the IRS's audits and has provided tens of thousands of pages of non-privileged material to the IRS. (Welty Decl. ¶¶ 15-17.) Schaeffler's exceptional cooperation and transparency, however, has not satisfied the IRS. Earlier this year, the IRS tried to completely evade U.S. privilege laws by issuing an untimely and improper treaty request to the German taxing authority to collect privileged documents, including, but not limited to, those requested in the Summons. (Welty Decl. ¶¶ 23-25.) Nevertheless, Schaeffler has remained dedicated to its good-faith and fair dealing approach and provided the IRS with a seventy-nine-page disclosure and guide to the complex restructuring and refinancing that contained graphical representations and narrative descriptions of each transactional step, identified the tax issues implicated by each step, and specified the reporting positions taken on the tax returns. (Welty Decl. ¶ 22.)

24.     The IRS attempted to obtain the privileged documents on April 26, 2013, through a third-party summons issued to EY in a location (California) with no relationship to the relevant events. (Martinkat Decl. ¶¶ 5-6, 11; Land Decl. ¶¶ 2, 10.) Schaeffler petitioned to quash that summons in the United States District Court for the Southern District of New York on May 17, 2013, and the Court set a preliminary hearing for June 4, 2013. However, on June 3, 2013, at the request of the IRS, the Court held a conference call during which the IRS requested an extension of time to file a response and prepare for the hearing, which the Court granted. (Welty Decl. ¶

11

26.) No response was ever filed and no hearing was ever held. (Welty Decl. ¶ 26.) Instead, on June 19, 2013, the IRS formally withdrew the prior summons to EY. (Welty Decl. ¶ 26.) On June 25, 2013, the IRS issued the Summons currently at issue in this proceeding, which is identical in substance to the summons previously issued to EY. On June 27, 2013, the previous proceeding was dismissed since the IRS withdrew the prior summons.

25.     The current Summons specifically requests "all documents created by [EY], including but not limited to legal opinions, analysis and appraisals, that were provided to parties outside the Schaeffler Group." (Ex. A.) The Summons thus seeks: (1) information EY shared, at Schaeffler's direction, with Schaeffler's outside legal counsel (Dentons or other law firms); (2) information EY shared, at Schaeffler's direction, with the Bank Consortium pursuant to a common legal interest; and (3) information EY shared with third parties without Schaeffler's authorization, if any such records exist.

26.     Schaeffler has not yet had an opportunity to review the documents in EY's possession and control that are responsive to the Summons, and Schaeffler objects to any disclosure of documents without the full opportunity to review the EY documents. (Welty Decl. ¶ 27.) Schaeffler is working diligently to gather and review documents that are responsive to various IDRs that have been issued by the IRS during the 2009-2010 examination, and a complete privilege log will be provided to the IRS once that review is finalized. (Welty Decl. ¶ 19.) The EY documents that are responsive to the Summons are part of this massive document review process, and Schaeffler is working diligently with EY to gather and review these EY documents. Once completed a privilege log identifying those EY documents that are responsive to the Summons will be provided to the IRS and to the Court.

## V.    ARGUMENTS AND AUTHORITIES

27.    The IRS's power to obtain information by summons is "not absolute and is limited by the traditional privileges, including the attorney client privilege" and the work product doctrine.    *Upjohn Co. v. United States*, 449 U.S. 383, 398 (1981).    Here, the IRS seeks confidential legal advice and analysis that is protected from disclosure by the work product doctrine and attorney-client privilege.    The language in the Summons appears to agree with these underlying privilege claims and indicates reliance on a theory that those protections have been waived by disclosure to third-parties.    The IRS cannot circumvent these protections by limiting the Summons to material provided to parties outside Schaeffler since none of the documents at issue were disclosed in a manner that is inconsistent with the preservation of those underlying privileges.    Therefore, Schaeffler[3] has not waived work product or any applicable privileges and the Summons should be quashed in its entirety.

### A.    The Documents Are Protected As Work Product

#### 1.    The Work Product Doctrine Protects Documents That Were Created Because Of The Prospect Of Litigation

28.    The work-product doctrine preserves "a zone of privacy in which a lawyer can prepare and develop legal theories and strategy with an eye toward litigation, free from

---

[3] An attorney (or tax-practitioner) cannot waive the protection of work product or privilege without the consent of the client—the privilege holder.    *See, e.g., Republic Gear Co. v. Borg-Warner Corp.*, 381 F.2d 551, 556 (2d Cir. 1967); *see also In re von Bulow*, 828 F.2d at 102 (holding that attorney's publication of confidential client communications in a book, without the client's consent, did not constitute waiver); *Schnell v. Schnall*, 550 F. Supp. 650, 653 (S.D.N.Y. 1982) (holding that attorney's prior voluntary disclosure to SEC, without proof of client's consent, did not constitute waiver in subsequent litigation).    Any disclosure by EY without Schaeffler's express permission does not waive the protection.    Schaeffler does not have any reason to believe that such disclosures occurred.

unnecessary intrusion by his adversaries." *United States v. Adlman*, 134 F.3d 1194, 1196 (2d Cir. 1998). Rule 26(b)(3) states that, subject to limited exceptions:

> [A] party may not discover documents and tangible things that are prepared in *anticipation of litigation* or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent)

Fed. R. Civ. P. 26(b)(3) (emphasis added). According to the Second Circuit, a document is prepared in anticipation of litigation—and thus may be protected from discovery—if "the document can fairly be said to have been prepared or obtained because of the prospect of litigation." *Adlman*, 134 F.3d at 1202. Put another way, a document qualifies as work product so long as it would not have "been created in essentially similar form irrespective of the litigation." *Id.* Moreover, a document that satisfies this standard "does not lose protection . . . merely because it is created in order to assist with a business decision." *Id.*; *see also Long-Term Capital Holdings v. United States*, No. 3:01-CV-1290 (JBA), 2002 WL 31934139, at *9 (D. Conn. Oct. 30, 2002) ("[W]hile the [tax opinion] may have been prepared in part to assist in a business decision, it is nevertheless eligible for work product protection because it is a document that was prepared with an eye toward litigation.").

29.    In *Adlman*, a case closely analogous to this one, the Second Circuit made clear that legal tax analysis generated by a tax practitioner in anticipation of an IRS audit is work product even if that material also assists in making a business decision. *Adlman*, 134 F.3d at 1195. There, the IRS sought production of a document containing the tax analysis of the taxpayer's advisor at Arthur Anderson. *Id.* at 1195-96. The taxpayer had engaged Arthur Anderson to evaluate the tax implications of a proposed restructuring that would produce tax consequences that were expected to be challenged by the IRS. *Id.* at 1195. Arthur Anderson

created a memorandum containing its analysis that detailed the likely IRS challenges to the
reorganization; discussed Treasury regulations, judicial decisions, and IRS authorities; proposed
possible legal theories; and recommended preferred methods of structuring the transactions. *Id.*
The Second Circuit reasoned that the work product doctrine extended to such documents
prepared to "assess the desirability of a business transaction, which, if undertaken, would give
rise to" litigation. *Id.*

30.     In *Adlman*, the Second Circuit found that the magnitude and complexity of the
transaction, the company's history of being surveyed or audited by the IRS, and the novelty of
the legal questions all supported the reasonable anticipation of litigation with the IRS. *Id.* at
1196.   Other courts have likewise found the anticipation of litigation based on similar
considerations.  *See United States v. Roxworthy*, 457 F.3d 590, 600 (6th Cir. 2006) (finding
anticipation of "litigation" in the form of an anticipated IRS audit based upon the company's
size, the large tax consequences resulting from the transaction, audit history, and the unsettled
nature of certain of the legal aspects); *United States v. ChevronTexaco Corp.*, 241 F. Supp. 2d
1065, 1082 (N.D. Cal. 2002) (finding anticipation of litigation where taxpayer "reasonably
believed that it was a virtual certainty that the IRS would challenge the . . . transaction" because
the company's tax returns were routinely examined by the IRS, the company was engaged in a
transaction involving "a very substantial amount of tax dollars," and the IRS "had previously
questioned similar transactions.").

31.     For the same reasons, Schaeffler, its executives, and its advisors all anticipated an
IRS audit, adversarial proceedings, and the prospect of litigation from the earliest planning
stages of the refinancing and restructuring.  Indeed, it was "immediately apparent" to Mr.
Schaeffler that the majority interest in Conti and the magnitude of the necessary refinancing and

restructuring "would have significant U.S. tax and reporting implications" and, "[a]s a U.S. trained lawyer, [Mr. Schaeffler] expected that the [IRS] would examine these events closely." (Schaeffler Decl. ¶ 8.)

32.     Schaeffler also had recent experience with the IRS when Mr. Schaeffler's 2001 amended returns and his original 2004 return were examined in 2007.  That examination concluded in 2008 after the congressional Joint Committee on Taxation approved a refund. (Welty Decl. ¶ 5.)   Contact with the IRS continued in 2009 after "Schaeffler, the Bank Consortium, [EY], and Dentons all concluded that, with respect to several major issues, an IRS private letter ruling request was appropriate and necessary to proceed with the proposed refinancing and restructuring." (Teitelbaum Decl. ¶ 14.) A pre-submission conference to discuss the request with the IRS was held on August 24, 2009, and a forty-six (46) page ruling request was submitted on November 30, 2009.[4]  (Teitelbaum Decl. ¶ 14; Welty Decl. ¶¶ 6, 8.)   On December 4, 2009, Schaeffler received notice that the IRS was initiating an audit of the 2007 and 2008 tax returns of several Schaeffler entities.  That examination was eventually expanded to include additional Schaeffler entities, Mr. Schaeffler's personal return, and the 2006 tax year. (Welty Decl. ¶ 9.)  The IRS initiated the current 2009-10 examinations shortly after the 2006-08 examinations closed in August 2012.  (Welty Decl. ¶¶ 10-11.)  Ultimately, Mr. Schaeffler's belief that "audits of [his] 2009 and 2010 tax returns were essentially inevitable" was proven correct.  (Schaeffler Decl. ¶ 25.)

33.     Others shared Mr. Schaeffler's view.  Schaeffler's General Counsel "believed that the refinancing and restructuring were of sufficient magnitude and produced correspondingly

_____

[4] A series of five (5) additional submissions for the private letter ruling were made in 2010, providing supplemental detail in response to IRS inquiries.  (Teitelbaum Decl. ¶ 14).

significant U.S. tax consequences that the IRS's review and perhaps challenge of the transactions was likely." (Declaration of Klaus Deissenberger, attached as Exhibit E ("Deissenberger Decl.") ¶ 7). The Bank Consortium also "appreciated that there was a significant risk that the IRS might audit those transactions, and that a dispute over one or more of the tax issues could arise, if only because of the complexity of the issues, the lack of clarity in the law, and amounts involved." (Land Decl. ¶ 4.)

34.    Finally, the attorneys and accountants Schaeffler engaged to advise on these matters confirmed that IRS scrutiny and litigation were likely.  The EY partner who led the EY engagement team that created the documents the IRS now seeks "believed that the 2009 and 2010 refinancing and restructuring transactions under consideration were likely to gain IRS attention and be audited." (Martinkat Decl. ¶ 7.)  Likewise, Schaeffler's attorney at Dentons believed that "the issues that had to be resolved were extraordinarily complex and, in certain respects, unusual from a U.S. tax point of view," and that "an IRS audit of the relevant tax years was highly probable and a dispute over at least some of the reported tax consequences was likely." (Teitelbaum Decl. ¶¶ 6, 11.)

35.    If Schaeffler had not anticipated litigation, EY would not have created the documents in the form in which they were created.  According to Mr. Schaeffler, "tax issues at Schaeffler are typically handled directly by our internal tax department and with the assistance of outside tax advisors." (Schaeffler Decl. ¶ 10.)  "[T]he extraordinary U.S. tax issues" arising out of the refinancing and restructuring, however, "were distinctly complicated and unusual, and would plainly require the effort of a large group of advisors." (Schaeffler Decl. ¶ 10.)  But for that fact, "neither [Dentons] nor [EY] would have been engaged" with respect to these issues. (Schaeffler Decl. ¶ 10.); *see also* (Declaration of Harald Dewert, attached as Exhibit D ("Dewert

Decl.") ¶6) ("Due to the complexities and magnitude of the U.S. tax implications of Schaeffler's stock acquisition of [Conti], outside tax and legal advisors at [Dentons and EY] were engaged to review and advise on the U.S. tax consequences and risks associated with the refinancing and restructuring.").

36.     The contents of the documents sought, including the EY Tax Memo, also confirm they were created with an eye towards IRS scrutiny and litigation.  The documents were not of the type that would have been generated in the course of preparing Schaeffler's tax returns, meeting its financial reporting obligations, or addressing tax accruals.  *See* (Rosenfeld Decl. ¶ 14; Teitelbaum Decl. ¶¶ 23-24.)   The documents, instead, related to the restructuring and contained legal analysis of the potential litigation.  As explained by Mr. Schaeffler, EY's advice was given in anticipation of litigation:

> [EY's] advice was communicated to Schaeffler, in oral and written form, to assist Schaeffler in understanding the likely tax consequences of the refinancing and restructuring, to assess the arguments the IRS would likely make in a dispute over Schaeffler's tax treatment of the transactions, and to weigh the potential risks Schaeffler would face if the tax consequences of the transactions were litigated . . . .

(Schaeffler Decl. ¶ 15); *see also* (Martinkat Decl. ¶¶ 3-4, 8; Teitelbaum Decl. ¶¶ 23-24; Schaeffler Decl. ¶ 23.)  In addition, Schaeffler's executives responsible for assessing the general litigation and tax litigation risk also anticipated litigation with the IRS.  *See id.*; (Deissenberger Decl. ¶ 6; Dewert Decl. ¶ 9; Schaeffler Decl. ¶¶ 17-18.)  In short, the EY tax advice created pursuant to this representation was made in anticipation of IRS scrutiny and litigation, placing them squarely within the work product doctrine.

### 2. The IRS Cannot Demonstrate "Exceptional Justification" To Overcome The Work Product Protection

37.     The documents that the IRS demands "fall within the most protected category of work product—that which shows the mental impressions, conclusions, opinions or legal theories of an attorney or other representative." *Adlman*, 134 F.3d at 1204.  The documents include, for example, "[k]ey EY tax advice and analysis . . . memorialized in a several hundred-page memorandum [that] contains EY's analysis and advice concerning the U.S. federal tax treatment of various aspects of the Schaeffler Group's 2009 and 2010 restructuring and refinancing, including an analysis of the possible challenges by the IRS."  (Martinkat Decl. ¶ 8.)  In short, those documents are opinion work product.  Such documents—which are the heart of the IRS's Summons—receive the greatest possible protection afforded to work product.

38.     According to the Federal Rules, the Supreme Court, and the Second Circuit, the discovery of opinion work requires "exceptional" justification.  Fed. R. Civ. P. 26(b)(4)(B) (allows for discovery of opinions only upon showing of "exceptional circumstances"); *Upjohn Co. v. United States*, 449 U.S. 383 (1981) ("While we are not prepared at this juncture to say that [opinion work product] is always protected by the work-product rule, we think a far stronger showing of necessity and unavailability by other means . . . would be necessary to compel disclosure"); *In re Grand Jury Proceedings*, 219 F.3d 175 (2d Cir. 2000) (at minimum, "opinion" work product should remain protected until and unless a highly persuasive showing is made).

39.     The IRS has not demonstrated—and cannot demonstrate—a sufficient need to overcome the protections afforded opinion work product.  First, the IRS has no necessity for the documents.  The Second Circuit has already rejected the argument—made by the IRS in

*Adlman*—that documents created by an accountant in anticipation of an IRS audit and litigation "will provide insight into [the taxpayer's] subjective motivation for engaging in corporate restructuring and is thus relevant to determining whether the transaction was motivated by a legitimate business purpose." 134 F.3d at 1204. To the contrary, such documents do "not reflect the motives of [a client's] executives, but rather the legal analysis of its accountants." *Id.*

40. Second, the IRS cannot make a sufficient showing that whatever relevant information that may be contained in the documents is unavailable by other means. Throughout the course of the 2009 and 2010 examinations, Schaeffler has gone to extraordinary lengths to cooperate with the IRS. (Welty Decl. ¶ 17.) This cooperation has included the production of tens of thousands of pages of documents in response to the IRS's IDRs, as well as the provision of voluminous factual and reporting information necessary to conduct the examinations. Documents Schaeffler has produced to the IRS thus far include, but are not limited to, operative refinancing and sales agreements, transaction documents and corporate chronologies related to the refinancing and restructuring, legal and tax organizational charts, detailed tax calculations with specific instructions and references to the returns under exam, financial data, and valuation reports used to prepare the tax returns under audit. (Welty Decl. ¶ 18.)

41. Additionally, in an attempt to promote transparency and cooperation with the IRS, Schaeffler provided the IRS with a detailed seventy-nine-page guide of both the refinancing and restructuring transactions. (Welty Decl. ¶ 22.) In short, Schaeffler has already provided the IRS all facts needed to conduct its examination and even packaged them in a step-by-step guide. But by issuing the Summons, which is clearly targeted at EY's opinion work product, the IRS now seeks to "take a free ride on the research and thinking" of Schaeffler's advisors. *United States v. Frederick*, 182 F.3d 496, 500 (7th Cir. 1999) (citing *Hickman v. Taylor*, 329 U.S. 495, 510-511

(1947) (Jackson, J. concurring) (summarizing the history and origin of the work product doctrine). Here, Schaeffler draws the line. Cooperation and transparency do not require waiver. And given the extent of Schaeffler's cooperation, the IRS has no exceptional need that would override the protection of this work product material.

### 3.   The Work Product Protection Has Not Been Waived

42.   Because the documents coveted by the IRS are opinion work product and because the IRS cannot demonstrate an extraordinary need for production of those documents, the IRS's only chance of obtaining them is to argue that the work product protection has been waived. This strategy is reflected by the fact that the IRS only seeks documents that have been shared outside the Schaeffler Group. (Ex. A.). The IRS's strategy fails because those documents have not been shared in a way that waives that protection.

43.   "The work product privilege is not automatically waived by any disclosure to third persons." *Merrill Lynch & Co., Inc. v. Alleghany Energy, Inc.*, 229 F.R.D. 441, 445 (S.D.N.Y. 2004). Indeed, the Second Circuit has held that work product may be shown to others, "simply because there was some good reason to show it," without waiving the privilege. *Adlman*, 134 F.3d at 1200 n. 4. Because the purpose of the work product doctrine is to "protect material from an opposing party in litigation," the applicable standard for determining whether a disclosure to a third party constitutes a waiver is not merely whether the documents were shared. Instead, the standard is whether such disclosure is consistent with maintaining secrecy against one's opponents. *United States v. Stewart*, 287 F. Supp. 2d 461 (S.D.N.Y. 2003); *Merrill Lynch*, 229 F.R.D. at 445 ("[T]he courts generally find a waiver of the work product privilege only if the disclosure substantially increases the opportunity for potential adversaries to obtain the information."). Work product protection is thus "waived only if the party has voluntarily

disclosed the work product in such a manner that it is likely to be revealed to his adversary." *Bank Brussels Lambert v. Chase Manhattan Bank, N.A.*, No. 93 Civ. 5298, 1996 WL 944011, at *3 (S.D.N.Y. Dec. 19, 1996); *see In re Steinhardt Partners, L.P.*, 9 F.3d 230, 235 (2d Cir. 1993) ("voluntary disclosure of work product to an adversary waives the privilege as to other parties").

44.     There is no credible argument that Schaeffler's attorneys (Dentons) were adversaries to their former and current client Schaeffler while engaged in an ongoing attorney-client relationship.   Therefore, work product protection has not been waived on protected documents created by EY that were given to Dentons.

45.     Furthermore, Schaeffler did not waive work product protection by disclosing certain documents to the Bank Consortium.   Recognizing the risk of IRS scrutiny and likely litigation, the Bank Consortium and Schaeffler "agreed to pursue a common plan to achieve tax compliance and reporting certainty, to minimize large IRS audit adjustments, and to realistically evaluate reporting positions and potential IRS audit outcomes."   (Land Decl. ¶ 7.)   Accordingly, Schaeffler directed EY to share the documents with the Bank Consortium pursuant to a common legal interest.   In light of this common legal interest, the Bank Consortium was not an adversary.

46.     Nor did disclosure of those protected documents to the Bank Consortium make the work product more likely to be revealed to an adversary.   Indeed, as explained by the lead U.S. tax counsel for the Bank Consortium, Schaeffler made sure that the confidentiality of the documents being shared was fully protected pursuant to the ACP Agreements that all of the parties—including the Bank Consortium and their advisors—entered into. (Land Decl. ¶ 8.) The agreements "memorialized the parties' common legal interest and provided that privileged information exchanged or otherwise communicated pursuant to the agreement would be protected from disclosure by, among other protections, the common legal interest doctrine, and

this information or communications were to otherwise remain confidential and privileged." (Land Decl. ¶ 8.)   Because of these precautions, disclosure of the documents to the Bank Consortium did not make it more likely that they would be revealed to an adversary.

47.    The Second Circuit discussed a comparable fact pattern in *Adlman*, in which it noted several practical situations where protected documents can be shared with third parties without constituting waiver, including the disclosure of litigation analysis to a company's bank. *See Adlman*, 134 F.3d at 1199-1200.   As an example of a disclosure that remains privileged, the court described the situation where a company's bank requests access to an analysis of the company's "attorneys' most intimate strategies and assessments concerning [certain] litigation" to inform its lending policy toward the company.  *Id.*  The court stated that disclosure of such analysis to the bank would not effect a waiver—"[w]e can see no reason why . . . [a] litigation adversary should have access to [such analysis]."  *Id.* at 1200.

48.    Accordingly—and contrary to the central premise of the IRS Summons—sharing the documents did not make disclosure to an adversary more likely.  It thus did not constitute waiver of the work product protection.  Because that protection remains in full force, none of those protected documents are discoverable.   This alone is sufficient grounds to quash the Summons.

### B.   The Documents That The Summons Seeks Are Privileged

49.    In addition to being protected as work product, the documents that the IRS demands are also protected by attorney-client (or tax practitioner) privilege.  The Second Circuit has made clear that if parties share a common legal interest, they may share privileged information among themselves in furtherance of that common interest without causing a privilege waiver. *See United States v. Schwimmer*, 892 F.2d 237, 243 (2d Cir. 1989).  Because

the documents were privileged at the time of their creation, and because Schaeffler shared them with the Bank Consortium pursuant to a common legal interest, the documents are not discoverable.

### 1.   EY's Tax Analysis is Subject To The Tax Practitioner Privilege

50.    The tax practitioner privilege is co-extensive with attorney-client privilege pursuant to 26 U.S.C. § 7525. *See United States v. Frederick*, 182 F.3d 496, 502 (7th Cir. 1999) (I.R.C. § 7525 "extends the attorney-client privilege to 'a federally authorized tax practitioner,' that is, a non-lawyer who is nevertheless authorized to practice before the Internal Revenue Service."). And, for privilege purposes, there is no difference between legal advice and tax advice that goes beyond mere calculations and advises a client on tax compliance. "Tax advice rendered by an attorney [or, in this case, a federally authorized tax practitioner through 26 U.S.C. § 7525] is legal advice within the ambit of the privilege." *In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983*, 731 F.2d 1032, 1037 (2d Cir. 1984) (holding that consultation as to the tax consequences of a reorganization and whether those consequences should affect the structure of a corporate realignment is privileged legal advice).

51.    The tax advice sought by the Summons is protected under attorney-client privilege.  The parties with whom Schaeffler shared those documents were Schaeffler's outside legal counsel and the Bank Consortium.  Obviously, material shared with Schaeffler's outside legal counsel for legal advice is privileged.  Notably, the Bank Consortium's tax attorney referred to the shared materials as certain core advice. (Land Decl. ¶ 7.)  Indeed, Schaeffler's Chief Financial Officer described the documents that Schaeffler shared with the Bank Consortium as consisting of "legal analyses addressing the potential U.S. tax issues implicated by the refinancing and restructuring." (Rosenfeld Decl. ¶ 12.)  In short, the IRS is attempting to

cherry-pick the most sensitive—and privileged—documents.   But under any conceivable standard, documents that contain such "core advice" and "legal analyses" are privileged.

### 2.   Schaeffler Shared The EY-Created Documents With The Bank Consortium Pursuant To A Common Legal Interest

52.   The common interest doctrine "is an exception to the general rule that voluntary disclosure of confidential, privileged material to a third party waives any applicable privilege." *Fireman's Fund Ins. Co. v. Great Am. Ins. Co.*, 284 F.R.D. 132, 139 (S.D.N.Y. 2012).   The doctrine "serves to protect the confidentiality of communications" between parties that have aligned their interests and embarked upon a common legal strategy.   *United States v. Schwimmer*, 892 F.2d 237, 243 (2d Cir. 1989).   The protection of the common interest doctrine applies here because Schaeffler and the Bank Consortium shared "a common legal, rather than commercial, interest," and because Schaeffler shared the documents with the Bank Consortium in furtherance of a common legal strategy.   *Fireman's Fund*, 284 F.R.D. at 139.

#### a)   *Schaeffler And The Bank Consortium Shared A Common Legal Interest*

53.   To preserve privilege, the common interest must be predominately—but not exclusively—legal in nature.   *See Schwimmer*, 892 F.2d at 243 (this common interest rule has developed from a desire to protect communications between similarly-situated parties once a common "strategy has been decided upon and undertaken by the parties and their respective counsel."); *see also Allied Irish Banks PLC v. Bank of Am. N.A.*, 252 F.R.D. 163, 171 (S.D.N.Y. 2008) ("The [common] interest must be 'primarily or predominantly . . . legal rather than . . . commercial.'").

54.   Notwithstanding the obvious economic consequences of a tax liability, a common interest in taxes is legal, not economic.   *Bank of Am., N.A. v. Terra Nova Ins. Co. Ltd.*, 211 F.

Supp. 2d 493, 498 (S.D.N.Y. 2002) (distinguishing a common legal interest—"such as the avoidance of tax liability"—from a commercial venture).    Accordingly, this Court recognizes that tax advice sought for the purposes of avoiding unexpected tax liabilities is a legal interest within the scope of the common legal interest doctrine and reach of the attorney-client privilege. *Id.*; *see also United States v. BDO Seidman, LLP*, 492 F.3d 806, 816 (7th Cir. 2007) ("joint venturers[] shared a common legal interest 'in ensuring compliance with the new regulation issued by the IRS,' and in making sure that they could defend their product against potential IRS enforcement actions."); *United Techs. Corp.*, 979 F. Supp. at 108 (holding consortium of companies planning to set up jointly owned company shared common legal interest in documents addressing how to develop corporate structure that would minimize U.S. tax liability of all consortium members and thus, attorney-client privilege applied and the IRS was not entitled to the documents) (cited with approval in *Bank of Am., N.A.*, 211 F. Supp. 2d at 493, 498).

55.    Here, the Bank Consortium and Schaeffler shared a predominately legal interest: "the U.S. tax implications of any debt refinancing and restructuring plan."  (Land Decl. ¶ 5.) "Accordingly, there was no waiver of . . . attorney-client privilege." *See Schwimmer*, 892 F.2d at 243; *In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983*, 731 F.2d at 1037.  Because the Bank Consortium—under the unique circumstances of Schaeffler's Conti stock acquisition, refinancing, and restructuring—essentially agreed to fund Mr. Schaeffler's taxes, Schaeffler and the Bank Consortium shared a common legal interest in the taxes and tax advice.  (Land Decl. ¶¶ 5-7; Schaeffler Decl. ¶¶ 12-14; Rosenfeld Decl. ¶ 8; Teitelbaum Decl. ¶¶ 16-19.)  Specifically, given the certainty of an IRS audit, Schaeffler and the Bank Consortium were completely aligned in correctly assessing the U.S. tax implications and risks of the refinancing and restructuring of Schaeffler, complying with all U.S. tax laws and regulations in the most tax-efficient manner,

minimizing potential tax liabilities, planning to defend any IRS challenge, evaluating potential IRS audit outcomes, and, if necessary, preparing to contest in good faith any proposed tax adjustment.  (Land Decl. ¶¶ 5-7; Schaeffler Decl. ¶¶ 7, 12-14, 21; Rosenfeld Decl. ¶ 12; Teitelbaum Decl. ¶¶ 15-21.)  Despite the ultimate economic consequences both parties sought to avoid (i.e., default and company instability or insolvency), their common interest in Mr. Schaeffler's taxes was, at a minimum, *predominately* legal.  *See Schwimmer*, 892 F.2d at 243; *Terra Nova*, 211 F. Supp. 2d at 498.

> b)    *Schaeffler Shared Privileged Documents With The Bank Consortium In Furtherance Of The Parties' Common Legal Interest*

56.    Schaeffler's disclosure of documents to the Bank Consortium regarding the U.S. tax advice was in furtherance of a common legal interest.  *See Schwimmer*, 892 F.2d at 243 ("Only those communications made in the course of an ongoing common enterprise and intended to further the enterprise are protected.").

57.    Schaeffler and the Bank Consortium shared legal analyses for the express purpose of pursuing a plan to achieve their common legal goals regarding Mr. Schaeffler's U.S. taxes.  According to the Bank Consortium's U.S. counsel, Schaeffler and the Bank Consortium "agreed to pursue a common plan to achieve tax compliance and reporting certainty, to minimize large IRS audit adjustments, and to realistically evaluate reporting positions and potential IRS audit outcomes."  (Land Decl. ¶ 7.).  And as explained by Mr. Schaeffler, "Schaeffler and the Bank Consortium were aligned and shared the common legal goals of complying with all U.S. tax laws and regulations in a tax-efficient manner, planning to defend an IRS examination, and if necessary, preparing to contest in good faith any proposed tax adjustment."  (Schaeffler Decl. ¶ 12.)  In furtherance of this common legal strategy, Schaeffler shared certain EY-created

documents with the Bank Consortium to enable it to "fully evaluate the U.S. tax consequences and possible outcomes from a tax controversy." (Land Decl. ¶ 7.)

58.     Prior to any disclosure of documents, the parties and their legal advisors documented the common legal interest and executed a formal written agreement that provided the terms for the exchange or communication of privileged, protected, and confidential information. (Land Decl. ¶ 8; Schaeffler Decl. ¶¶ 21-22, 24; Rosenfeld Decl. ¶¶ 12-13; Teitelbaum Decl. ¶¶ 21-22.)[5] Further, to the best of each parties' knowledge and belief, all parties have complied with that agreement and the confidentiality of the communications has not been violated. (Land Decl. ¶ 9; Schaeffler Decl. ¶¶ 15-16; Teitelbaum Decl. ¶¶ 25-26.)

59.     Because disclosures to the Bank Consortium were made pursuant to a common legal interest, privilege was not waived. Thus, this Court should quash the Summons in its entirety because it seeks information protected by privilege.

## C.   The IRS Issued The Summons For An Improper Purpose

60.     Because the Summons squarely calls for production of privileged documents, the IRS has issued the Summons for an improper purpose, and the Court should quash it.[6] The Second Circuit has affirmed that the IRS's attempts to invade attorney-client privilege and other similar privileges constitute improper purpose within the meaning of *Powell,* barring summons enforcement. *Powell,* 379 U.S. at 57-58; *PAA Mgmt., Ltd.,* 962 F.2d at 216 (citing *Reisman v.*

_____

[5] To establish a common interest, it is not necessary that Schaeffler prove that such written agreements exist. However, courts have held that demonstrable steps taken to protect the confidentiality of privileged communications support the application of the common interest rule. *See, e.g., United Techs. Corp.,* 979 F. Supp. at 112.

[6] *United States v. Powell,* 379 U.S. 48, 58 (1964) ("Such an abuse would take place if the summons had been issued for an improper purpose, such as to harass the taxpayer or to put pressure on him to settle a collateral dispute, or for any other purpose reflecting on the good faith of the particular investigation.").

*Caplin,* 375 U.S. 440, 449 (1964) (holding use of summons power in breach of attorney-client privilege is improper under *Powell*); *Mfrs. & Traders Trust Co.,* 703 F.2d at 53 (observing that invasion of a recognized privilege like the attorney-client privilege could be evidence of the IRS's "improper purpose" under *Powell*); *see also Euge,* 444 U.S. at 714 (holding that the summons power is "subject to the traditional privileges and limitations"); *Upjohn Co.,* 449 U.S. at 398 (same); *United States v. Arthur Young & Co.,* 465 U.S. 805, 816 (1984) (same). Accordingly, the Court should quash the Summons because the IRS's disregard of these privileges is clear evidence of its improper purpose under *Powell.*

61.     Schaeffler has gone to great lengths to cooperate with the IRS.  On August 24, 2009, the IRS met with Schaeffler representatives at a private letter ruling pre-submission conference.  (Welty Decl. ¶ 6; Teitelbaum Decl. ¶ 14.)  The private letter ruling request was submitted to the IRS on November 30, 2009, and the ruling was ultimately granted on August 6, 2010, but not before Schaeffler made five supplemental submissions.  (Welty Decl. ¶¶ 7-8; Teitelbaum Decl. ¶ 14.)  Schaeffler also provided the IRS with an additional roadmap to the admittedly complex restructuring and refinancing during the current examinations.  (Welty Decl. ¶ 22.)  Schaeffler's exceptional cooperation and transparency, however, have not satisfied the IRS.  From the onset of the current examinations, the IRS has demanded the production of privileged and protected documents.  (Welty Decl. ¶¶ 13, 15-16.)  Additionally, the IRS continues its attempts to deprive Schaeffler of its right to have a United States court review privileges invoked under applicable law.  (Welty Decl. ¶¶ 23-25.)

62.     Further evidence of the IRS's improper purpose in this case includes its refusal to cooperate with Schaeffler in Schaeffler's attempts to voluntarily comply with the IDR request

process[7] and its issuance of the Summons in California, a remote and unconnected location evidently for purposes of forum-shopping. What the IRS now seeks to obtain through this Summons is precisely the type of tactical litigation advantage derived from the fruits of its adversary's litigation preparation that *Hickman* proscribed. *See Hickman v. Taylor*, 329 U.S. 495 (1947). Dissatisfied with anything short of Schaeffler's legal advice and analysis, the IRS issued the Summons for the production of privileged and protected documents. The IRS is not entitled to this information and, in any event, cannot demonstrate any need for its continued attempts to violate Schaeffler's privileges, especially in light of the extraordinary disclosures already provided to the IRS. (Welty Decl. ¶ 22.) Accordingly, the Court should quash the Summons.

### D. Conclusion

63.    Based on Schaeffler's review of documents created by EY in Schaeffler's possession, and on information and belief, the key documents requested in the Summons were created by EY at Schaeffler's direction in anticipation of litigation and are protected under the work product doctrine of Fed. R. Civ. P. 26(b)(3). Furthermore, the EY documents contain communications that are privileged under the attorney-client privilege and the federal tax practitioner privilege of I.R.C. § 7525. Those privileged or protected documents that were provided to parties other than the Schaeffler Group (as defined in the Summons) were disclosed pursuant to an attorney-client privilege and common legal interest—as documented in contemporaneous confidentiality and common interest agreements—and therefore, both the work product protection and attorney-client privilege remain fully intact.

---

[7] *See* I.R.M. 25.5.1.4 (instructing agents to "[a]ttempt to obtain information voluntarily from the taxpayer and other witnesses prior to issuing a summons."); (Welty Decl. ¶¶ 15-26.).

64.     In support of the Petition, Schaeffler submits and incorporates herein by reference the following supporting declarations and exhibits thereto: (1) the Summons, Exhibit A; (2) Schaeffler Decl., Exhibit B; (3) Rosenfeld Decl., Exhibit C; (4) Dewert Decl., Exhibit D; (5) Deissenberger Decl., Exhibit E; (6) Martinkat Decl., Exhibit F; (7) Land Decl., Exhibit G; (8) Teitelbaum Decl., Exhibit H; and (9) Welty Decl., Exhibit I.

65.     In addition, Schaeffler is prepared to present *in camera* additional evidence, including the key EY Tax Memo.

## VI.     RELIEF REQUESTED

WHEREFORE, Schaeffler respectfully requests that the Court:

(1) Quash the Summons in its entirety for the reasons stated herein.

(2) Alternatively, perform an *in camera* inspection of the privileged and protected documents and quash the Summons to the extent that Schaeffler, after review of the EY documents, identifies documents that are subject to work product protection or the attorney client privilege.

(3) Grant Schaeffler such other and further relief as the Court may deem just and proper.

Dated:  July 12, 2013

Respectfully submitted,

Justin N. Kattan
DENTONS US LLP
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 768-6700
Facsimile: (212) 768-6800
justin.kattan@dentons.com

ATTORNEYS FOR PETITIONERS

80425443