UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
GEORG F. W. SCHAEFFLER et al.,            :

            Petitioners,            :         <u>OPINION AND ORDER</u>

            -v.-            :         13 Civ. 4864 (GWG)

UNITED STATES OF AMERICA.,        :

            Respondent.          :
------------------------------------------------------------------X
**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**


APPEARANCES:



Justin Kattan, M. Todd Welty, Mark P. Thomas, Dentons US LLP, New York, New York, for petitioners

Rebecca S. Tinio, Assistant United States Attorney, Preet Bharara, United States Attorney, New York, New York, for respondent.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
GEORG F. W. SCHAEFFLER et al.,                    :

                Petitioners,          :          <u>OPINION AND ORDER</u>

                -v.-                 :          13 Civ. 4864 (GWG)

UNITED STATES OF AMERICA.,              :

                Respondent.          :
------------------------------------------------------------X
**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

      As part of its investigation into the federal tax liability of Georg F.W. Schaeffler, the

Internal Revenue Service ("IRS") served an administrative summons on Schaeffler's accountant,

Ernst & Young.  Schaeffler, together with a number of entities he controls, have now petitioned

to quash the summons on the ground that it calls for privileged materials  The United States

Government has opposed the petition.  The parties consented to disposition of this matter by a

United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).  For the reasons stated below, we

deny the petition to quash.

I.    <u>BACKGROUND</u>

      A.    <u>Schaeffler's Acquisition of Continental AG</u>

      Schaeffler owns 80% of INA-Holding Schaeffler GmbH & Co. KG ("IHO"), which is

itself an indirect owner of Schaeffler Holding GmbH & Co. KG ("SH-KG"), and is also the sole

owner of Schaeffler Holding, LP ("Schaeffler LP") (collectively the "Schaeffler Group").  <u>See</u>

Declaration of Georg F. W. Schaeffler in Support of Schaeffler's Petition to Quash Summons,

dated May 16, 2013 (annexed as Ex. B to Petition to Quash Internal Revenue Service Summons,

filed July 12, 2013 (Docket # 1) ("Pet.")) ("Schaeffler Decl."), ¶ 4.  The Schaeffler Group is

headquartered in Herzogenaurach, Germany, and is involved in the business of manufacturing and distributing bearings and other automotive and industrial components.  Id.

On July 30, 2008, the Schaeffler Group made a tender offer to buy shares of Continental AG ("Conti"), a German supplier of automotive and industrial parts.  Id. ¶¶ 5-6.  The Schaeffler Group had expected to limit its acquisition to less than 50% of Conti's outstanding shares.  Id. ¶ 6.  However, as a result of the stock market downturn in September 2008, a majority of Conti shareholders accepted the tender offer for € 70-75 per share, and the Schaeffler Group ended up amassing 89.9% of Conti's outstanding shares.  Id.  The cost of this acquisition was € 11 billion. Id. ¶ 7.  From August 27, 2008, to February 24, 2009, the market value of Conti shares plummeted from approximately € 74 to € 11.  Id. ¶ 6.

The Schaeffler Group's acquisition was funded by a consortium of banks (the "Bank Consortium"), which had pledged to finance the Schaeffler tender offer pursuant to a July 12, 2008 loan agreement.  Id. ¶ 7; Declaration of Klaus Rosenfeld in Support of Schaeffler's Petition to Quash Summons, dated May 16, 2013 (annexed as Ex. C to Pet.) ("Rosenfeld Decl."), ¶ 5. Given the unexpected result of the tender offer and the dire economic conditions at that time, the Schaeffler Group had "significant solvency concerns" about its ability to service the debt to the Bank Consortium.  See Schaeffler Decl. ¶ 7.  Accordingly, the Schaeffler Group recognized the need to undertake substantial debt refinancing and corporate restructuring measures.  Id. ¶ 5; Rosenfeld Decl. ¶ 5.

      B.    <u>Ernst & Young and Dentons' Representation of Schaeffler</u>

Because the Schaeffler Group viewed the tax issues raised by the Conti acquisition and the planned refinancing and restructuring to be unusually complex, it did not use its internal tax department but instead hired outside tax and legal advisors at Dentons US LLP ("Dentons") and

Ernst & Young LLP.  Schaeffler Decl. ¶ 10; Rosenfeld Decl. ¶ 9; Declaration of Harald Dewert in Support of Schaeffler's Petition to Quash Summons, dated May 13, 2013 (annexed as Ex. D to Pet.) ("Dewert Decl."), ¶ 6.  Schaeffler's corporate lawyers at Allen & Overy also advised the Schaeffler Group regarding these issues.  Schaeffler Decl. ¶ 11.  Ernst & Young provided tax advice "on the various U.S. tax implications of the Schaeffler Group's proposed refinancing and restructuring related to the unanticipated consequences resulting from the Schaeffler Group's acquisition of Continental AG."  Declaration of John Martinkat in Support of Schaeffler's Petition to Quash Summons, dated May 16, 2013 (annexed as Ex. F to Pet.) ("Martinkat Decl."), ¶ 3.  Specifically, "EY prepared tax memoranda and other tax analysis that identified potential U.S. tax consequences of the refinancing and restructuring, and identified and analyzed possible IRS challenges to the Schaeffler Group's tax treatment of the transactions at issue."  Id. ¶ 4. John Martinkat, a partner at Ernst & Young, describes one such document, which we will refer to as the "EY Tax Memo."  He states that this memorandum contained "EY's analysis and advice concerning the U.S. federal tax treatment of various aspects of the Schaeffler Group's 2009 and 2010 restructuring and refinancing, including an analysis of the possible challenges by the IRS [discussing] in detail the statutory provisions, Treasury regulations, judicial decisions, and IRS rulings relevant to various aspects of the transactions."  Id. ¶ 8.  The Court has examined this document in camera as is discussed in section II.B.3 below.

Dentons similarly "provided Schaeffler with U.S. tax and legal advice . . . in oral and written form, to assist Schaeffler in evaluating the likely tax consequences of the refinancing and restructuring, to assess the arguments the IRS would likely make in any dispute of Schaeffler's tax treatment of the transactions, and to weigh the potential risks Schaeffler would face if the tax consequences of the transactions were litigated or otherwise challenged by the IRS."

Declaration of Marc Teitelbaum in Support of Schaeffler's Petition to Quash Summons, dated May 17, 2013 (annexed as Ex. H to Pet.) ("Teitelbaum Decl."), ¶ 12.  Specifically, Dentons gave legal advice on the following issues: "controlled foreign corporation ('CFC') U.S. tax principles; significant troubled company issues; German bank regulatory issues; the Conti debt covenant restrictions; German creditors' rights, securities, and merger and acquisition laws; and the differences between U.S. and German legal forms and tax law." Id. ¶ 6.

Schaeffler sought the outside tax and legal advisors at Ernst & Young and Dentons because he believed that "(1) acquiring an indirect majority ownership interest in Conti, a large non-U.S. corporation, and (2) the obviously necessary refinancing of the Conti stock acquisition debt and associated corporate restructuring would have significant U.S. tax and reporting implications."  Schaeffler Decl. ¶ 8.  Furthermore, "[d]ue to the magnitude of the restructuring, the complexity of the U.S. tax issues, and the material amounts potentially at issue, [Schaeffler] expected, from the earliest planning stages of the refinancing and restructuring, that an IRS audit and possible dispute over at least some of the tax consequences was very likely, if not inevitable."  Id. ¶ 19. This view was shared by his employees, see Dewert Decl. ¶ 8; Declaration of Klaus Deissenberger in Support of Schaeffler's Petition to Quash Summons, dated May 14, 2013 (annexed as Ex. E to Pet.), ¶ 7, and his tax and legal advisors, see Martinkat Decl. ¶ 7; Teitelbaum Decl. ¶ 11.

Schaeffler asserts that "[b]ut for" this expectation that the refinancing and restructuring measures would have "significant U.S. tax and reporting implications" and that the IRS would "examine these events closely," neither Dentons nor Ernst & Young "would have been engaged" for their services.  Schaeffler Decl. ¶¶ 8, 10.  Schaeffler's belief that the IRS would challenge his 2009 and 2010 tax returns was reinforced by the fact that he had recently been subjected to IRS

4

audits.  See Schaeffler Decl. ¶ 25.  Schaeffler's 2001 and 2004 amended U.S. federal income tax

returns had been examined by the IRS in the 2007-08 time period.  Id.; accord Declaration of M.

Todd Welty in Support of Schaeffler's Petition to Quash Summons, dated July 7, 2013 (annexed

as Ex. I to Pet.) ("Welty Decl."), ¶ 5.  In 2009, the IRS began examinations of Schaeffler's 2006,

2007, and 2008 returns.  Schaeffler Decl. ¶ 25.  Schaeffler believed that "audits of [his] 2009 and

2010 tax returns were essentially inevitable."  Id.

Throughout 2008 and 2009, Dentons and Ernst & Young tax and legal advisors worked

together with the Schaeffler Group both to "devise a viable debt refinancing and restructuring"

plan, Teitelbaum Decl. ¶ 8, and to evaluate the likely tax implications of such measures, id. ¶¶ 9-

13.  Schaeffler treated the communications with Dentons and Ernst & Young as "confidential."

See id. ¶ 15; see also Rosenfeld Decl. ¶ 10; Dewert Decl. ¶ 9.  The advisors at Dentons and Ernst

& Young have also asserted that they maintained the confidentiality of these communications.

See Martinkat Decl. ¶ 12; Teitelbaum Decl. ¶ 12.  Eventually, "[d]ue to the magnitude and

complexity of the issues . . . and because of the anticipated audit and the potential controversy

with the IRS," Schaeffler sought a private letter ruling from the IRS.  Teitelbaum Decl. ¶ 14; see

generally 26 C.F.R. § 601.201.  On August 6, 2010, the IRS ruled in favor of Schaeffler's

proposed core tax treatment of the refinancing and restructuring measures.  See Welty Decl. ¶ 8.

C.    Communications Between Schaeffler and the Bank Consortium

By all accounts, the Schaeffler Group, Ernst & Young, and Dentons worked closely with

the Bank Consortium not only in effectuating the refinancing and restructuring but also in

analyzing the tax consequences of the Conti acquisition.  The Bank Consortium was represented

by Linklaters LLP.  See Declaration of Stephen B. Land in Support of Schaeffler's Petition to

Quash Summons, dated May 17, 2013 (annexed as Ex. G to Pet.) ("Land Decl."), ¶ 4.  Stephen

Land, a Linklaters partner who worked on the assignment, explained that the Bank Consortium "was concerned about the U.S. tax implications of any debt refinancing and restructuring plan, since the resulting tax consequences could materially affect the Schaeffler Group's net cash flow and assets that would otherwise be available to repay the [Consortium's] debt." Id. ¶ 5. Early in the refinancing negotiations, Schaeffler and the Bank Consortium reached an agreement, which they have referred to as the "Ringfencing provisions," under which the Bank Consortium subordinated its claims for repayment of Schaeffler's debt to the payment of Schaeffler's personal tax liabilities. See Teitelbaum Decl. ¶ 16; Schaeffler Decl. ¶ 13. The Ringfencing provisions allowed Schaeffler to prioritize up to € 885 million of his personal tax liabilities over repayment of the debt owed to the Bank Consortium. Rosenfeld Decl. ¶ 8. The Bank Consortium also agreed to provide an additional line of credit to pay Schaeffler's tax liabilities up to € 250 million. Teitelbaum Decl. ¶ 19. The Ringfencing provisions required "Schaeffler to notify the Bank Consortium of a material audit or investigation" by the IRS and to "permit the Bank Consortium the opportunity to advise on any proposed action — including contesting or settling the tax dispute — before proceeding." Schaeffler Decl. ¶ 14.

The Schaeffler Group and the Bank Consortium agreed to share legal analyses addressing the potential tax implications regarding the restructuring and refinancing measures. Rosenfeld Decl. ¶ 12. To this end, they signed an agreement, referred to as the Attorney Client Privilege ("ACP") Agreement, in which they expressed their desire to "share privileged, protected, and confidential documents and their analyses without waiving those privileges, protections, or the confidentiality of the information." Id. ¶¶ 12-13. Rosenfeld states that "the ACP Agreement was an important prerequisite for sharing the tax advice with the Bank Consortium," id. ¶ 15, and that he has "no reason to believe that the parties to the ACP Agreement, in fact, have not

6

maintained through the present time, the confidentiality of all information shared pursuant to the ACP Agreement," id. ¶ 16.  Although the ACP Agreement has not been made part of the record, Teitelbaum asserts that it "provides that information exchanged or otherwise communicated pursuant to the ACP Agreement that is protected from disclosure by U.S. privileges or protection, including, but not limited to, the attorney-client privilege, work-product doctrine, and the tax practitioner privilege of I.R.C. § 7525, will remain privileged and protected under the common legal interest doctrine, joint defense doctrine, or other available privileges and protections."  Teitelbaum Decl. ¶ 22.

Following execution of the ACP Agreement, the Schaeffler Group shared with the Bank Consortium certain documents containing tax advice.  See Land Decl. ¶ 9; Teitelbaum Decl. ¶ 21.  It is these documents, which were created by Ernst & Young and disclosed by Schaeffler to outside parties, that the Government has asked Ernst & Young to produce.  See IRS Summons to Ernst & Young, dated June 25, 2013 (annexed as Ex. A to Pet.) ("IRS Summons").  Out of the approximately 10,000 responsive Ernst & Young documents, petitioners have described only the EY Tax Memo, which they allege analyzed "numerous legal issues, cases, and tax authorities, discusse[d] theories the IRS may advance to challenge the transactions, and note[d] the strengths and weaknesses of Schaeffer's tax and legal positions."  Teitelbaum Decl. ¶ 23.

D.    The IRS Audit of Schaeffler's 2009 and 2010 Tax Returns

Notwithstanding the IRS's private letter ruling in 2010 approving Schaeffler's proposed core tax treatment of the restructuring and refinancing measures, see Welty Decl. ¶ 8, the IRS began to examine Schaeffler's 2009 and 2010 federal income tax returns in 2012, id. ¶ 11.  On July 26, 2012, the IRS sent Schaeffler a letter stating it intended to audit Schaeffler's personal tax returns as well as the Schaeffler Group's returns for the 2009 and 2010 taxable years.  Id.

Official audit notices were then sent to Schaeffler and the Schaeffler Group on August 15, 2012. Id. ¶ 12.

When the IRS issued an Information Document Request ("IDR") to Schaeffler in September 2012, Schaeffler invoked "all privileges and protections that exist under U.S. law — including, but not limited to, the attorney-client privilege, the work product doctrine, 26 U.S.C. § 7525, and the common interest doctrine — to prevent the disclosure of any privileged and protected information, including, but not limited to, tax opinions." Id. ¶ 13. On October 19, 2012, Schaeffler's counsel met with the IRS to discuss "the withdrawal or narrowing of the scope of [the IDR] . . . in order to avoid a costly and time-consuming privilege fight," but the "IRS refused to withdraw or narrow the scope of [the IDR]." Id. ¶ 15. On November 8, 2012, the IRS issued a second IDR requesting "[a]ll tax opinions and tax analysis that discuss the U.S. tax consequences of any and all steps of [Schaeffler's] restructuring." Id. ¶ 16.

Through July 2013, the IRS issued 86 IDRs requesting information regarding Schaeffler's 2009 and 2010 tax returns, and Schaeffler has in response produced tens of thousands of pages of documents. Id. ¶ 17. In petitioners' view, "Schaeffler has provided the IRS with voluminous factual and reporting information necessary to conduct the examinations of the 2009 and 2010 tax returns . . . [including] the operative refinancing and sales agreements, transaction documents and corporate chronologies related to the refinancing and restructuring, legal and tax organizational charts, detailed tax calculations with specific instructions and references to the returns under exam, financial data, and valuation reports used to prepare the tax returns under audit." Id. ¶ 18.

E.     The Instant Motion to Quash

On June 25, 2013, the IRS issued an administrative summons to Ernst & Young.  Id.

¶ 26; see also Declaration of Paul Doerr, filed Nov. 26, 2013 (Docket # 20) ("Doerr Decl."), ¶ 5.

In relevant part, the IRS Summons commanded Ernst & Young to: "Provide all documents

created by Ernst & Young, including but not limited to legal opinions, analysis and appraisals,

that were provided to parties outside the Schaeffler Group, that relate to (1) the debt

restructuring of Schaeffler Group's approximately €11 billion debt for the purchase of

Continental AG or (2) the restructuring of the Schaeffler entities in conjunction with the debt

restructuring."  IRS Summons (emphasis in original).

On July 12, 2013, petitioners filed this action pursuant to 26 U.S.C. § 7609(b)(2) to quash

the IRS Summons on the ground that "it seeks 'legal opinions' and other confidential advice that

are protected from disclosure by both the work product doctrine and the attorney-client privilege,

as extended to EY pursuant to the tax practitioner privilege of 26 U.S.C. § 7525."  Pet. at 1-2;

see also Amended Petition to Quash Internal Revenue Service Summons, filed Nov. 8, 2013

(Docket # 14) ("Am. Pet.").  Later, petitioners submitted a privilege log.[1]  The parties filed briefs

and other documents regarding the merits of the petition.[2]  At the request of the Court, see Order,

---

[1]  See Notice of Filing of Volumes 1 to 4 of the Privilege Log, filed Nov. 6, 2013 (Docket # 12); Notice of Filing of Volumes 5 to 8 of the Privilege Log, filed Nov. 22, 2013 (Docket # 17); Notice of Filing of Volume 9 of the Privilege Log, filed Dec. 20, 2013 (Docket # 24); Notice of Filing of Volume 10 of the Privilege Log, filed Dec. 30, 2013 (Docket # 27); see also Notice of Filing of Amended Volumes 1-10 of the Privilege Log, filed Jan. 17, 2014 (Docket # 32).

[2]  See Memorandum of Law in Opposition to Petition to Quash and in Support of Summary Enforcement, filed Nov. 25, 2013 (Docket # 18) ("Opp. Mem."); Doerr Decl; Memorandum of Law in Reply to Respondent's Answer, filed Dec. 18, 2013 (Docket # 23) ("Pet. Reply"); Supplemental Declaration of M. Todd Welty in Support of Schaeffler's Petition to Quash Summons, dated Dec. 12, 2013 (attached to Pet. Reply); Second Supplemental

dated Apr. 16, 2014 (Docket # 45), petitioners submitted a copy of the EY Tax Memo for <u>in camera</u> inspection.  That memorandum, together with its cover letter, have been filed under seal. <u>See</u> Ernst & Young Tax Memorandum, filed under seal on May 8, 2014 (Docket # 53).

II.    <u>DISCUSSION</u>

   A.    <u>Attorney-Client/ Tax Practitioner Privilege</u>

   Petitioners argue that the Ernst & Young documents are privileged and that no waiver of this privilege occurred when they provided the documents to the Bank Consortium because petitioners and the Bank Consortium had a common legal interest.  <u>See</u> Am. Pet. ¶¶ 49-59.

      1.    <u>Governing Law</u>

   26 U.S.C. § 7525(a)(1) provides that

> With respect to tax advice, the same common law protections of confidentiality which apply to a communication between a taxpayer and an attorney shall also apply to a communication between a taxpayer and any federally authorized tax practitioner to the extent the communication would be considered a privileged communication if it were between a taxpayer and an attorney.

The scope of this privilege — commonly referred to as "the tax practitioner privilege" —  is essentially "coterminous" with the attorney-client privilege.  <u>Evergreen Trading, LLC ex rel. Nussdorf</u>, 80 Fed. Cl. 122, 135 (Fed. Cl. 2007); <u>see</u> also <u>Valero Energy Corp. v. United States</u>, 569 F.3d 626, 630 (7th Cir. 2009) ("This privilege is no broader than the existing attorney-client privilege.  It merely extends the veil of confidentiality to federally authorized tax practitioners

---

Declaration of Marc Teitelbaum in Support of Schaeffler's Petition to Quash Summons, dated Nov. 25, 2013 (attached to Notice of Filing of Declarations in Support of Schaeffler's Petition to Quash Summons, filed Jan. 17, 2014 (Docket # 33) ("Supp. Decl. Notice")); Declaration of Dr. Walter Uebelhoer in Support of Schaeffler's Petition to Quash Summons, dated Jan. 17, 2014 (attached to Supp. Decl. Notice); Reply Memorandum of Law in Further Opposition to Petition to Quash and in Further Support of Summary Enforcement, filed Feb. 10, 2014 (Docket # 40); Supplemental Declaration of Paul Doerr, dated Jan. 21, 2014 (Docket # 42).

who have long been able to practice before the IRS . . . to the same extent communications would be privileged if they were between a taxpayer and an attorney.") (internal citations and punctuation omitted).  Additionally, it has been found that waiver of the tax practitioner privilege occurs "on the same terms" as waiver of the attorney-client privilege.  See Salem Fin., Inc. v. United States, 102 Fed. Cl. 793, 798 (Fed. Cl. 2012) (citation omitted); Evergreen Trading, 80 Fed. Cl. at 135.  Accordingly, in applying the tax practitioner privilege, we look to the law governing attorney-client privilege.  See United States v. BDO Seidman, 337 F.3d 802, 810 (7th Cir. 2003) ("Because the scope of the tax practitioner-client privilege depends on the scope of the common law protections of confidential attorney-client communications, we must look to the body of common law interpreting the attorney-client privilege to interpret the § 7525 privilege."); United States v. KPMG LLP, 316 F. Supp. 2d 30, 35 (D.D.C. 2004) ("Following as it must the text of § 7525, this Court addresses any claims of § 7525 privilege in the same manner as it does for the attorney-client privilege.").

In cases such as this where claims are based on federal statutes, the attorney-client privilege is governed by federal common law.  See, e.g., Curto v. Med. World Commc'n, Inc., 783 F. Supp. 2d 373, 378 (E.D.N.Y. 2011); Crosby v. City of New York, 269 F.R.D. 267, 274 (S.D.N.Y. 2010); Lego v. Stratos Lightwave, Inc., 224 F.R.D. 576, 578 (S.D.N.Y. 2004).  Under federal common law, "[t]he attorney-client privilege protects communications (1) between a client and his or her attorney (2) that are intended to be, and in fact were, kept confidential (3) for the purpose of obtaining or providing legal advice."  United States v. Mejia, 655 F.3d 126, 132 (2d Cir. 2011) (citing In re Cnty. of Erie, 473 F.3d 413, 419 (2d Cir. 2007)); accord United States v. Ghavami, 882 F. Supp. 2d 532, 536 (S.D.N.Y. 2012) (citations omitted).  "The purpose of the privilege is to encourage clients to make full disclosure to their attorneys," and thus, "the

11

privilege protects communications between a client and an attorney, not communications that prove important to an attorney's legal advice to a client." United States v. Ackert, 169 F.3d 136, 139 (2d Cir. 1999) (quotation marks and citation omitted); accord Stryker Corp. v. Intermedics Orthopedics, Inc., 145 F.R.D. 298, 301 (E.D.N.Y. 1992).  Courts acknowledge that "[w]hile the privilege confers important social benefits, it also exacts significant costs [because] [i]t runs counter to the ordinary judicial interest in the disclosure of all relevant evidence." Application of Sarrio, S.A., 119 F.3d 143, 147 (2d Cir. 1997) (citation omitted); accord In re Bairnco Corp. Secs. Litig., 148 F.R.D. 91, 96 (S.D.N.Y. 1993) (noting that "the attorney-client privilege both advances and impedes the administration of justice").  Accordingly, courts apply the attorney-client privilege "only where necessary to achieve its purpose" and "construe the privilege narrowly because it renders relevant information undiscoverable." Mejia, 655 F.3d at 132 (quotation marks and citations omitted).

"It is axiomatic that the burden is on a party claiming the protection of a privilege to establish those facts that are the essential elements of the privileged relationship, . . . a burden not discharged by mere conclusory or ipse dixit assertions." In re Grand Jury Subpoena Dated Jan. 4, 1984, 750 F.2d 223, 224-25 (2d Cir. 1984) (quotation marks and internal citation omitted); accord Ghavami, 882 F. Supp. 2d at 536.  The party invoking the privilege also has the burden to show that the privilege has not been waived.  See Hollis v. O'Driscoll, 2013 WL 2896860, at *1 (S.D.N.Y. June 11, 2013) (citing Denney v. Jenkens & Gilchrist, 362 F. Supp. 2d 407, 412 (S.D.N.Y. 2004)); accord United States v. Finazzo, 2013 WL 619572, at *6 (E.D.N.Y. Feb. 19, 2013).

In general, the attorney-client privilege is waived when "the client voluntarily discloses the documents to a third party." Fifty-Six Hope Road Music Ltd. v. UMG Recordings, Inc.,

2010 WL 343490, at *1 (S.D.N.Y. Feb. 1, 2010); see also In re Horowitz, 482 F.2d 72, 81 (2d

Cir. 1973) ("We deem it clear that subsequent disclosure to a third party by the party of a

communication with his attorney eliminates whatever privilege the communication may have

originally possessed . . . ."); United States v. Kerik, 531 F. Supp. 2d 610, 617 (S.D.N.Y. 2008)

("Where attorney-client communications are disclosed for reasons other than obtaining legal

advice to a third party at the direction of the client there is no expectation of privacy or

confidentiality, and thus, the client cannot assert the privilege.").  However, such a disclosure

does not waive the attorney-client privilege when it is made between "parties [who] are

represented by separate counsel but engage[d] in a common legal enterprise."  See Bank

Brussels Lambert v. Credit Lyonnais (Suisse) S.A., 160 F.R.D. 437, 447 (S.D.N.Y. 1995).  Often

referred to as the "common interest" rule or "joint defense privilege," this rule is not in fact a

separate privilege but rather "an extension of the attorney client privilege."  United States v.

Schwimmer, 892 F.2d 237, 243 (2d Cir. 1989) (citation and internal quotation marks omitted).

The rule

> serves to protect the confidentiality of communications passing from one party to
> the attorney for another party where a joint defense effort or strategy has been
> decided upon and undertaken by the parties and their respective counsel . . . .
> Only those communications made in the course of an ongoing common enterprise
> and intended to further the enterprise are protected . . . . The need to protect the
> free flow of information from client to attorney logically exists whenever multiple
> clients share a common interest about a legal matter, . . . and it is therefore
> unnecessary . . . for the attorney representing the communicating party to be
> present when the communication is made to the other party's attorney.

Id. at 243-44 (citations and internal quotation marks omitted).

To obtain the benefit of the common interest rule, the party claiming the protection of

attorney-client privilege must demonstrate "that the parties communicating: (1) have a common

legal, rather than commercial, interest; and (2) the disclosures are made in the course of

formulating a common legal strategy." Ghavami, 882 F. Supp. 2d at 537-38 (quoting Sokol v.

Wyeth, Inc., 2008 WL 3166662, at *5 (S.D.N.Y. Aug. 4, 2008)); accord Allied Irish Banks,

P.L.C. v. Bank of Am., N.A., 252 F.R.D. 163, 171 (S.D.N.Y. 2008); HSH Nordbank AG N.Y.

Branch v. Swerdlow, 259 F.R.D. 64, 71 (S.D.N.Y. 2009); Gulf Islands Leasing, Inc. v.

Bombardier Capital, Inc., 215 F.R.D. 466, 471 (S.D.N.Y. 2003).[3]  This showing must be based

on competent evidence, such as affidavits, deposition testimony or other admissible evidence.

Gulf Islands, 215 F.R.D. at 472; accord Chevron Corp. v. Donziger, 296 F.R.D. 168, 203

(S.D.N.Y. 2013).

    Because the common interest rule requires the common interest to be legal, and not

merely commercial, it "does not encompass a joint business strategy which happens to include as

one of its elements a concern about litigation." Bank Brussels Lambert, 160 F.R.D. at 447.

"Although the distinction between a common legal, as opposed to commercial, interest is

somewhat murky, a common legal interest has been defined as one in which the parties have

been, or may potentially become, co-parties to a litigation . . . or have formed a coordinated legal

strategy." In re Subpoena Duces Tecum Served on N.Y. Marine and Gen. Ins. Co, 1997 WL

599399, at *4 (S.D.N.Y. Sept. 26, 1997) (citations and internal punctuation omitted).

    While courts have traditionally taken the view that the common legal interest must be

"identical," see Terra Nova, 211 F. Supp. 2d at 496; Denney, 362 F. Supp. 2d at 415, recently

---

[3] Although we cite exclusively to federal cases in determining the privilege issues, we in some instances cite to federal cases interpreting New York law in light of the fact that New York state law on attorney-client privilege is "generally similar to accepted federal doctrine." Bank of Am., N.A. v. Terra Nova Ins. Co. Ltd., 211 F. Supp. 2d 493, 495 (S.D.N.Y. 2002); see also HSH Nordbank, 259 F.R.D. at 71 n. 8 ("Because 'New York courts applying the common interest rule to civil proceedings have often looked to federal case law for guidance,' both New York and federal case law are instructive here.") (quoting Allied Irish Banks, P.L.C., 252 F.R.D. at 170).

some courts have held that the common legal interest need only be "nearly identical," Egiazaryan v. Zalmayev, 290 F.R.D. 421, 434 (S.D.N.Y. 2013); United States v. Doe, 429 F.3d 450, 453 (3rd Cir. 2005); F.D.I.C. v. Ogden Corp., 202 F.3d 454, 461 (1st Cir. 2000).

        2.     <u>Analysis</u>

Although the Government seems to argue that the requested documents were not privileged because the documents were not "intended to be . . . kept confidential," <u>see</u> Opp. Mem. at 17, we need not consider this issue because we find that, to the extent that any privilege existed, petitioners waived the privilege when they shared the documents with the Bank Consortium.

In support of their position that the common interest rule applies to the disclosure to the Bank Consortium, petitioners assert that the Bank Consortium and Schaeffler shared a "predominately legal interest" in the "U.S. tax implications of any debt refinancing and restructuring plan." Am. Pet. ¶ 55 (quoting Land Decl. ¶ 5). Petitioners contend that "[b]ecause the Bank Consortium — under the unique circumstances of Schaeffler's Conti stock acquisition, refinancing, and restructuring — essentially agreed to fund Mr. Schaeffler's taxes, Schaeffler and the Bank Consortium shared a common legal interest in the taxes and tax advice." <u>Id.</u> (citing declarations). They argue that "given the certainty of an IRS audit, Schaeffler and the Bank Consortium were completely aligned in correctly assessing the U.S. tax implications and risks of the refinancing and restructuring of Schaeffler, complying with all U.S. tax laws and regulations in the most tax-efficient manner, minimizing potential tax liabilities, planning to defend any IRS challenge, evaluating potential IRS audit outcomes, and, if necessary, preparing to contest in good faith any proposed tax adjustment." <u>Id.</u> (citing declarations). In petitioners' view, "[n]otwithstanding the obvious economic consequences of a tax liability, a common interest in

taxes is legal, not economic." Id. ¶ 54 (citing Terra Nova, 211 F. Supp. 2d at 498).

We accept that the Bank Consortium needed to understand in the greatest possible depth the risks to which it was subjecting itself by funding Schaeffler's personal tax liability. As Stephen Land, who represented the Bank Consortium during the negotiations with Schaeffler, put it: "the [Consortium] was concerned about the U.S. tax implications of any debt refinancing and restructuring plan, since the resulting tax consequences could materially affect the Schaeffler Group's net cash flow and assets that would otherwise be available to repay the [Consortium's] debt." Land Decl. ¶ 5. But as the Consortium's own attorney concedes, the reason why the Consortium needed access to Schaeffler's tax information was to assess its own "credit exposure." Id. ¶ 7. The Consortium worried that if there were substantial federal tax adjustments, this could lead to the "insolvency of all parties." Teitelbaum Decl. ¶ 15.

In light of these facts, we have no doubt that the Bank Consortium had an enormous stake in the tax consequences of Schaeffler's refinancing and restructuring decisions. It is also clear that predicting how the tax authorities would treat the transactions presented complex legal issues and thus required sophisticated legal analysis. But the two parties' shared interest in Schaeffler's tax liability was, in the end, an economic one: namely, a desire that the transactions receive favorable tax treatment from the federal tax authorities so that the Schaeffler Group could service its debt to the Bank Consortium. To be sure, this common economic interest depended on the resolution of legal issues regarding tax treatment. But this does not equate to a common "legal" interest as that term is used in case law.

The classic situation where parties share a common legal interest is where they are or may "potentially become, co-parties to a litigation." In re Subpoena Duces Tecum Served on N.Y. Marine and Gen. Ins. Co, 1997 WL 599399, at *4. Case law has also suggested that the

16

rule may apply where parties are formulating "a coordinated legal strategy." <u>Id.</u> (citing <u>Bank Brussels Lambert</u>, 160 F.R.D. at 448). But the rule does not encompass the situation where parties enter into a "joint business strategy which happens to include as one of its elements a concern about litigation." <u>Bank Brussels Lambert</u>, 160 F.R.D. at 447. That is essentially the situation in this case: a loan agreement between two parties where the result of future litigation is of concern to both sides because it will affect the debtor's ability to perform, but where the litigation does not involve the creditor and will work no change in the creditor's legal status.

None of the cases petitioners cite suggest that the common interest rule applies here. <u>United States v. United Techs. Corp.</u>, 979 F. Supp. 108 (D. Conn. 1997), found that where members of a consortium shared tax advice to minimize the tax liability of their jointly owned company, they shared a common legal interest. <u>Id.</u> at 112. However, in that situation, unlike in this case, the parties sharing the tax information were each facing tax liabilities for any deficiency. <u>Id.</u> Similarly, in <u>United States v. BDO Seidman, LLP</u>, 492 F.3d 806, (7th Cir. 2007), the parties who invoked the common interest rule were "joint venturers" who were "making sure that they could defend their [tax shelter] product against potential IRS enforcement actions." <u>Id.</u> at 816. Thus, in both <u>United Techs Corp.</u> and <u>BDO Seidman</u>, the parties who shared the privileged information were in essentially the same legal position vis-à-vis the IRS as the entities who received the information. Here by contrast, Schaeffler and the Bank Consortium stood in very different positions vis-à-vis the IRS. Schaeffler owed a legal obligation to the United States to pay the tax liability resulting from the restructuring transactions while the Bank Consortium had no such obligation. The Bank Consortium, by contrast, was merely Schaeffler's creditor. Although we accept that the Bank Consortium ardently desired to minimize Schaeffler's tax liabilities and to see him prevail in any dispute with the IRS, "[a] shared desire

17

to succeed in an action does not . . . rise to the level of a common legal interest." Johnson

Matthey, Inc. v. Research Corp., 2002 WL 1728566, at *6 (S.D.N.Y. July 24, 2002); see also

Terra Nova, 211 F. Supp. 2d at 496 ("The mere fact that the parties were working together to

achieve a commercial goal cannot by itself result in an identity of interest between the parties.");

Shamis v. Ambassador Factors Corp., 34 F. Supp. 2d 879, 893 (S.D.N.Y. 1999) ("Although [the

entities asserting a common interest] would both benefit from a judgment in favor of the

plaintiff, they do not share identical legal interests.  Indeed, sharing a desire to succeed in an

action does not create a common interest.") (internal quotation marks omitted).

The decision in Gulf Islands Leasing, Inc. v. Bombardier Capital, Inc., 215 F.R.D. 466

(S.D.N.Y. 2003), is instructive on this point.  Gulf Islands involved an agreement where an

entity called Gulf Islands Leasing leased a fractional interest in an aircraft from Bombardier

Aerospace.  A company affiliated with Bombardier Aerospace, Bombardier Capital, financed the

lease.  Litigation ultimately arose between Gulf Islands Leasing and Bombardier Aerospace.

Bombardier Aerospace claimed as privileged documents it had shared with Bombardier Capital,

invoking the common interest rule.  Bombardier Capital alleged that "its common legal interest

with Bombardier Aerospace was the interest both companies had in Gulf not breaching any of

the various agreements." Id. at 472.  The Court acknowledged that although Bombardier Capital

may have had "a desire to ensure that the sums owed by Gulf to Bombardier Capital under its

own agreements were paid," this was insufficient to invoke the common interest rule because

"[a] concern to ensure the payment of money is commercial in nature and does not qualify for

protection under the common interest rule." Id. at 472-73.  Additionally, the Court held that "to

the extent that the asserted interest could be construed to encompass a desire for Bombardier

Aerospace to reach a favorable outcome in the litigation with Gulf, it is also insufficient to

invoke the common interest rule [because] [a] concern shared by parties regarding litigation does not establish by itself that the parties held a common legal interest." Id. at 473.  Furthermore, the Court indicated that even if Bombardier Capital and Bombardier Aerospace had a "coordinated legal strategy" with respect to Bombardier Aerospace's litigation with Gulf, "such a coordinated legal strategy is insufficient where there is only a common commercial interest and no identity of legal interests."  Id.

Here, Schaeffler's reliance on the common interest rule fails for largely the same reasons. As was true for Bombardier Capital in Gulf Islands, it is not enough that the Bank Consortium had a desire for Schaeffler to succeed in a dispute with the IRS.  What is lacking is any common legal stake in Schaeffler's putative litigation with the IRS.  If the Bank Consortium could have been named as a co-defendant in the anticipated dispute with the IRS, the result would undoubtedly be different.  But only the Consortium's economic interests were in jeopardy.  See generally In re F.T.C., 2001 WL 396522, at *5 (S.D.N.Y. Apr. 19, 2001) (finding that although the relevant individuals shared legal advice and were "concerned about the consequences of failing to comply with applicable law and regulations[,] . . . this is simply not enough to transform their mutual commercial interest in the [business endeavor] into a coordinated legal strategy"); see also Walsh v. Northrop Grumman Corp., 165 F.R.D. 16, 19 (E.D.N.Y. 1996) (finding only a common commercial and not legal interest where the relevant entities were merely "developing a business strategy one of whose components was to avoid litigation if possible").

Another case cited by petitioners, Bank of Am., N.A. v. Terra Nova Ins. Co. Ltd., similarly suggests that the common interest rule does not apply to Schaeffler's disclosures to the Bank Consortium.  In Terra Nova, the plaintiff asserted that it had a common legal interest with

another party in "structuring and effectuating a credit agreement that was appropriately supported by reinsurance policies." 211 F. Supp. 2d at 497.  Terra Nova found that the common interest rule did not apply, stating that "[t]he mere fact that the parties were working together to achieve a commercial goal cannot by itself result in an identity of interest between the parties." Id.  The Court noted that "[i]t [was] of no moment that the parties may have been developing a business deal that included as a component the desire to avoid litigation . . . [because] such a desire does not transform their common interest and enterprise into a legal, as opposed to commercial, matter."  Id. (internal punctuation and citation omitted).

The fact that Schaeffler and the Bank Consortium signed the ACP Agreement before sharing any documents does not affect our finding that the common interest rule does not apply. The ACP Agreement merely "memorialized the parties' common legal interest and provided that privileged information exchanged or otherwise communicated pursuant to the agreement would be protected from disclosure . . . ."  Land Decl. ¶ 8.  While a written agreement like this can be relevant to "demonstrat[ing] actual cooperation toward a common legal goal," In re Rivastigmine Patent Litig., 2005 WL 2319005, at *4 (S.D.N.Y. Sept. 22, 2005), the mere assertion of a common legal interest in a written agreement cannot create such an interest.  What matters is whether there exists in actuality a common legal interest between the contracting parties.  Additionally, it is well-established that "a private agreement or promise of protection cannot by itself bar non-signatories from access to documents if they are otherwise discoverable."  In re Subpoena Duces Tecum Served on N.Y. Marine and Gen. Ins. Co, 1997 WL 599399, at *4 n. 3; see also SR Intern. Bus. Ins. Co. Ltd. v. World Trade Center Props. LLC, 2002 WL 1455346, at *5 (S.D.N.Y. July 3, 2002) ("[T]he fact that private parties agree that something is privileged does not make it so.");  Baxter Travenol Labs., Inc. v. Abbott Labs., 1987

WL 12919, at *2 (N.D. Ill. June 19, 1987) (finding that where the parties had entered into disclosure agreements in which they agreed to keep confidential the disclosed documents, this was "not sufficient to establish a community of interest").  In other words, if no common legal interest had previously existed, Schaeffler and the Bank Consortium could not create such an interest by fiat.

In sum, we conclude that common interest rule does not apply, and thus, any attorney-client or tax practitioner privilege that attached to the documents was waived when Schaeffler shared them with the Bank Consortium.

> B.    <u>Work Product Doctrine</u>

Petitioners argue in the alternative that the documents requested by the IRS Summons are protected under the work product doctrine.  <u>See</u> Am. Pet. ¶¶ 28-48; Pet. Reply at 2-7.

> 1.    <u>Governing Law</u>

Federal law governs the applicability of the work product doctrine in all actions in federal court.  <u>Allied Irish Banks, P.L.C.</u>, 252 F.R.D. at 173; <u>accord</u> <u>Weber v. Paduano</u>, 2003 WL 161340, at *3 (S.D.N.Y. Jan. 22, 2003).  The work product doctrine is codified in part in Federal Rule of Civil Procedure Rule 26(b)(3), which provides that a party is not entitled to obtain discovery of "documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative" unless the party shows substantial need and an inability to obtain the substantial equivalent to the documents without undue hardship. The purpose of the work product rule is "to preserve a zone of privacy in which a lawyer can prepare and develop legal theories and strategy 'with an eye toward litigation,' free from unnecessary intrusion by his adversaries."  <u>United States v. Adlman</u>, 134 F.3d 1194, 1196 (2d Cir. 1998) (quoting <u>Hickman v. Taylor</u>, 329 U.S. 495, 510–11 (1947)).  The work product

doctrine protects materials prepared not only by attorneys but also by their agents.  Costabile v. Westchester, N.Y., 254 F.R.D. 160, 164 (S.D.N.Y. 2008) (citing cases).  The party asserting work product protection "bears the burden of establishing its applicability to the case at hand."  In re Grand Jury Subpoenas Dated Mar. 19, 2002 & Aug. 2, 2002, 318 F.3d 379, 384 (2d Cir. 2003) (citing cases).  That party must show "that material it seeks to protect (1) was prepared in anticipation of litigation and (2) was prepared by or for a party, or by his representative."  Koch v. Greenberg, 2012 WL 1449186, at *5 (S.D.N.Y. Apr. 13, 2012) (citing In re Grand Jury Subpoenas Dated Mar. 19, 2002 & Aug. 2, 2002, 318 F.3d at 383–84).

Because the work product protection arises only for materials "prepared in anticipation of litigation," the doctrine is not satisfied merely by a showing that the material was prepared at the behest of a lawyer or was provided to a lawyer.  Rather, the materials must result from the conduct of "investigative or analytical tasks to aid counsel in preparing for litigation."  Costabile, 254 F.R.D. at 164 (citation omitted).  Additionally, the Second Circuit has interpreted the "in anticipation of litigation" requirement as asking whether "in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation."  Adlman, 134 F.3d at 1202 (internal quotation marks and citation omitted) (emphasis in original).  Thus, the work product protection does not apply to "documents that are prepared in the ordinary course of business or that would have been created in essentially similar form irrespective of the litigation . . . [e]ven if such documents might also help in preparation for litigation."  Id.  In determining whether the work product doctrine applies, a court must ask "not merely whether [the party invoking the privilege] contemplated litigation when it generated the materials at issue, but rather whether these materials 'would have been prepared in essentially similar form irrespective of litigation.'"

22

Allied Irish Banks v. Bank of Am., N.A., 240 F.R.D. 96, 106 (S.D.N.Y. 2007) (quoting Adlman,

134 F.3d at 1204).

A party invoking the work product doctrine need not have anticipated the specific

litigation in which the protection is actually invoked.  See Garrett v. Metro. Life Ins. Co., 1996

WL 325725, at *4 (S.D.N.Y. June 12, 1996) ("[A] document does not have to be created in

anticipation of the current litigation."); Bruce v. Christian, 113 F.R.D. 554, 561 (S.D.N.Y. 1986)

("The fact that the memoranda were not prepared for the present litigation is not determinative,

for the Supreme Court has noted that 'the literal language of the Rule [26(b)(3)] protects

materials prepared for any litigation or trial as long as they were prepared by or for a party to the

subsequent litigation.'") (quoting F.T.C. v. Grolier, Inc., 462 U.S. 19, 26 (1983)).  Thus, we

reject the Government's contention that invocation of the work product doctrine requires

petitioners to show that they "anticipated . . . a specific litigation over a future IRS summons to

EY relating to the Conti stock acquisition."  Opp. Mem. at 15.

> 2.   Waiver of Work Product Protection

Before addressing the merits of whether the documents at issue are subject to work

product protection, we first examine whether any such protection was waived when Schaeffler

provided the Ernst & Young documents to the Bank Consortium.  As a general rule, work

product protection is waived only "when the disclosure is to an adversary or materially increases

the likelihood of disclosure to an adversary."  Kingsway Fin. Servs., Inc. v. Pricewaterhouse-

Coopers LLP, 2008 WL 4452134, at *10 (S.D.N.Y. Oct. 2, 2008) (citations and internal

quotation marks omitted); accord In re Steinhardt Partners, L.P., 9 F.3d 230, 235 (2d Cir. 1993).

The proponent of the work product protection bears the burden of showing that the protection

has not been waived.  See Allied Irish Banks, P.L.C., 240 F.R.D. at 105.

23

Here, petitioners provided the EY Tax Memo and other responsive Ernst & Young documents to the Bank Consortium in furtherance of the refinancing negotiations.  See Martinkat Decl. ¶ 10; Teitelbaum Decl. ¶ 21-23; Land Decl. ¶ 9.  The Government contends that this disclosure constituted a waiver of any applicable work product protection because "the legal interests of Schaeffler are not necessarily identical to those of the Bank Consortium (indeed, one could easily imagine a scenario in which the Bank Consortium became an adversary of the Schaeffler Group), and the Petition does not establish that they are."  Opp. Mem. at 21 n. 4.  As an initial matter, the Government's argument misses the mark because there is no requirement that the disclosing and receiving parties have "identical" legal interests in order to avoid a work product protection waiver.  Moreover, we find that under the applicable test, there was no work product waiver in these circumstances.

In support of its argument, the Government cites various cases in which it was found that work product protection had been waived where a document had been disclosed to a non-adversarial third party.  Two of these cases involve disclosures to the Government and thus are not remotely similar to the situation presented here.  For example, in In re Terrorist Attacks on Sept. 11, 2001, 293 F.R.D. 539 (S.D.N.Y. 2013), the court found that the plaintiff had waived its work product protection when it disclosed its protected information to the Government because this led the information to be widely available to the public, including the plaintiff's adversaries, by way of the Freedom of Information Act.  Id. at 544.  Similarly, in Bank of Am., N.A. v. Terra Nova Ins. Co., 212 F.R.D. 166 (S.D.N.Y. 2002), this Court held that a company's work product protection had been waived when its officer provided the protected information and documents to governmental authorities because "[w]hen material is disclosed to a law enforcement agency without any agreement regarding confidentiality, there is a strong potential that the material may

24

ultimately become public and thus available to an adversary." Id. at 173.  A third case, Medinol, Ltd. v. Boston Scientific Corp., 214 F.R.D. 113 (S.D.N.Y. 2002), found that a company waived its work product protection when it provided its documents to an auditor.  Id. at 116-17.  The Medinol court based this conclusion on the fact that the auditor was entirely independent from the company.  Id. at 116 (likening auditor to a "public watchdog" and stating that "in order for auditors to properly do their job, they must not share common interests with the company they audit") (emphasis omitted).

Here, the documents were disclosed in furtherance of Schaeffler and the Bank Consortium's common commercial desire to avoid Schaeffler's default and insolvency.  See Teitelbaum Decl. ¶ 15; Land Decl. ¶¶ 5-7.  Accordingly, both Schaeffler and the Bank Consortium had an incentive to withhold the details of their refinancing negotiations from Schaeffler's potential adversaries, including the IRS.  In the cases cited by the Government, there was no showing that the parties who received the protected information had any common interest or any incentive to keep the shared information from the disclosing parties' adversaries.

Another important difference in our case is that petitioners were keenly aware of the risk of disclosing the confidential tax information to third parties and took measures to ensure that no other outside parties would see the confidential documents.  Before sharing the Ernst & Young documents, petitioners entered into the ACP Agreement with the Bank Consortium which imposed on both parties "a legal obligation to maintain the confidentiality of the communications shared pursuant to the ACP Agreement."  Schaeffler Decl. ¶ 22.  By contractually obligating the Bank Consortium to preserve the confidentiality of the Ernst & Young documents, petitioners lessened the possibility that their adversaries, including the IRS, would obtain the confidential information.  This is in contrast to the situation in Terra Nova,

25

where the court found that because the disclosing party had "made no effort to seek confidential treatment of the information" it had failed to show that "maintaining the secrecy of the [protected information] was of any importance to it."  212 F.R.D. at 173.

Accordingly, because petitioners and the Bank Consortium had similar interests at the time in which the disclosures were made and because the Bank Consortium was contractually required to keep the disclosed information confidential, petitioners' disclosure of the Ernst & Young documents did not "materially increase[ ] the likelihood of disclosure to an adversary." See Kingsway Fin. Servs., Inc., 2008 WL 4452134, at *10.

Furthermore, it makes no difference that, as the Government puts it, "one could easily imagine a scenario in which the Bank Consortium became an adversary of the Schaeffler Group."  Opp. Mem. at 21 n. 4.  The mere possibility that a dispute may arise at some point in the future between the disclosing party and the receiving party is insufficient to create a waiver of the work product protection.  See Ghavami, 882 F. Supp. 2d at 541 ("[T]here is always some danger that the recipient of work product is, or will later become, an informant.  But that cannot constitute a 'substantial risk' that the work product would be disclosed to the adversary.  If it did, the exception would swallow the rule, and the distinction between waiver of the attorney-client privilege and waiver of work product would be rendered a nullity."); accord United States v. Deloitte LLP, 610 F.3d 129, 140 (D.C. Cir. 2010) ("[T]he possibility of a future dispute between [the disclosing party] and [the receiving party] does not render [the receiving party] a potential adversary for the present purpose.  If it did, any voluntary disclosure would constitute waiver.")

Therefore, petitioners have shown that, to the extent that the Ernst & Young documents had any work product protection, this protection was not waived when petitioners shared the documents with the Bank Consortium.

3.      Merits of the Work Product Protection Claim

Turning to the merits of the work product protection claim, petitioners have asserted that the work product doctrine protects each of the approximately 10,000 responsive documents that Ernst & Young prepared in furtherance of the restructuring and refinancing measures.  See Am. Pet. ¶ 9.  However, the only document petitioners describe in any detail is the "EY Tax Memo," which appears on petitioners' privilege log more than a hundred times in various forms.  A 321-page draft of this memorandum, which has been provided to the Court for in camera review, expounds on the transactional steps that Ernst & Young proposed for the refinancing and restructuring.  The memorandum contains numerous appendices that provide detailed legal analysis of the federal tax issues implicated by each step.  This legal analysis makes reference to statutes, IRS regulations, IRS private letter rulings, other administrative materials, and case law. In many instances, the memorandum asserts that there is no law clearly on point and thus uses language such as "although not free from doubt," "the better view is that," "it may be argued," and "it is not inconceivable that the IRS could assert."  Additionally, in explaining its recommendations for handling particular aspects of the restructuring and refinancing measures, the memorandum considers at great length the arguments and counter-arguments that could be made by Schaeffler and the IRS with regard to the appropriate tax treatment of these measures. While there is copious citation to relevant legal authority, the memorandum does not specifically refer to litigation — for example, by discussing what actions peculiar to the litigation process Schaeffler or the IRS might take or what settlement strategies might be considered.  Rather, the memorandum contains detailed and thorough legal analysis as to the propriety of the planned measures and advocates what specific transactional steps should be taken.

Inasmuch as this is the only document that is described in any detail by petitioners, we

27

assume that the other documents listed on the privilege log are no more deserving of work product protection and thus that the EY Tax Memo represents Schaeffler's best case for application of the doctrine.  We will also accept that Schaeffler believed that litigation was highly probable in light of the significant and difficult tax issues that were raised by the planned refinancing and restructuring.  Accordingly, the Court is called upon to make the factual determination required by Adlman: whether this memorandum and the related documents "would have been created in essentially similar form" had litigation not been anticipated.  134 F.3d at 1202.  While we have described this as a factual determination, in reality it is a counterfactual determination because it requires the Court to imagine what "would have" happened in a world where Schaeffler did not anticipate litigation as to the restructuring and refinancing transactions but everything else was exactly the same — in other words, Schaeffler still found himself acquiring the unexpectedly large share of Conti stock and still needed to engage in a refinancing and restructuring arrangement that would comply with federal tax laws.

An unstated premise of Schaeffler's argument in this petition is that there was no reason for him to engage in the detailed and complex process of resolving the "complicated and unusual" tax issues that surrounded the transaction other than to prepare for litigation.  If he intends to make such an argument, it would require this Court to find that Schaeffler had no interest in complying with federal tax laws except to the extent it assisted him in the event there were an audit and subsequent litigation.  However, Schaeffler has not contended — nor do we have any reason to find— that he makes efforts to comply with federal tax laws only in situations where he fears being sued.  Accordingly, we assume a scenario under which Schaeffler is a legitimate businessperson who has a desire to operate his companies in accordance with the law and in accordance with his legal duties, including any fiduciary duty he owes to

28

shareholders.

Under this assumption, the first question the Court must consider is whether Schaeffler would have sought out the type of tax advice provided by Ernst & Young about the transaction had he not been concerned about an audit or litigation with the IRS.  Schaeffler's submissions make clear that the Conti acquisition, as well as the ensuing refinancing and restructuring measures, were enormously complex transactions that required significant legal assistance. Schaeffler states that "[a]lthough tax issues at Schaeffler are typically handled directly by our internal tax department and with the assistance of outside tax advisors, the extraordinary U.S. tax issues were distinctly complicated and unusual, and would plainly require the efforts of a large group of advisors."  Schaeffler Decl. ¶ 10.  Similarly, Dewert states that "[a]lthough U.S. tax and legal advisers were often engaged to advise Schaeffler on U.S. tax issues, the issues implicated by the acquisition were of far greater magnitude and significance than typical . . . [and thus] a significant number of U.S. tax advisers were working to address these issues."  Dewert Decl. ¶ 6. Additionally, the evidence from Schaeffler in this petition recognizes that, as one of the Bank Consortium's attorneys put it, there were a number of "complex" and "novel" federal tax issues "inherently" implicated in completing these transactions.  Land Decl. ¶ 4.  Indeed, the "magnitude of the financial obligations and corporate restructuring" that Schaeffler contemplated would by itself "require an effort of a very large group of tax advisors to work through the various issues."  Teitelbaum Decl. ¶ 6.  Thus, the complexity of the tax issues surrounding the relevant transactions engendered the need to hire outside attorneys and advisors as well as the need to generate the lengthy and detailed analysis contained in the EY Tax Memo. Furthermore, any sophisticated businessperson engaging in a complex financial transaction will naturally wish to obtain advice on the relevant tax laws so that the transaction can be structured

29

in such a way as to receive the most favorable tax treatment possible.  In other words, even in the absence of anticipated litigation, a businessperson would likely seek out the sort of tax advice that Ernst & Young provided to ensure that advantageous tax strategies are employed to their fullest potential.  Accordingly, given our assumption that Schaeffler is a rational businessperson who routinely makes efforts to comply with the law, we find that, even had he not anticipated an audit or litigation with the IRS, he still would have had to obtain the type of legal assistance provided by Ernst & Young to carry out the refinancing and restructuring transactions in an appropriate manner.

As to whether Ernst & Young's advice would have been different in content or form had it known that no audit or litigation would ensue, petitioners have presented no facts suggesting that Ernst & Young would have acted any differently.  To the contrary, as petitioners recognize, see Letter from M. Todd Welty, dated May 2, 2014 (Docket # 52) ("Welty Letter"), there exists legal authority demanding that tax practitioners not allow the possibility that a tax return will remain unaudited to affect the advice they give.  Treasury Department Circular 230 states:

> In evaluating the significant Federal tax issues addressed in [a tax opinion], the practitioner must not take into account the possibility that a tax return will not be audited, that an issue will not be raised on audit, or that an issue will be resolved through settlement if raised.

Circular 230, § 10.35(c)(3)(iii).  Similarly, a Treasury regulation regarding tax shelters states that in reaching conclusions regarding whether a particular tax position would more likely than not be sustained on its merits,

> the possibility that the position will not be challenged by the Internal Revenue Service (IRS) (for example, because the taxpayer's return may not be audited or because the issue may not be raised on audit) is not to be taken into account.

26 C.F.R. § 1.6694-2(b).  In other words, when tax practitioners give advice to clients, they must

ignore the actual possibility of an audit — and, by extension, litigation — in opining on the tax implications of a transaction.  Thus, when providing legal advice on the tax treatment of the restructuring and refinancing transactions, the Ernst & Young advisors had a responsibility to consider in full the relevant legal issues regardless of whether they anticipated an audit and ensuing litigation with the IRS.

It is of no significance that the EY Tax Memo may be characterized as providing an "opinion of the risks and probable outcome of litigation or other adversarial proceedings against the IRS in relation to the 2009 and 2010 refinancing and reorganization."  Teitelbaum Decl. ¶ 23. It is a truism that the way in which attorneys give advice regarding the legality of proposed actions is to consider the governing legal authorities and to analyze those authorities in the context of how they would be considered by a court hearing a hypothetical dispute.  Indeed, the American Institute for Certified Public Accountants Statements on Standards for Tax Services No. 1 — an authority relied upon by petitioners, see Welty Letter at 1 — states that "[a] member should not recommend a tax return position or prepare or sign a tax return taking a position unless the member has a good-faith belief that the position has at least a realistic possibility of being sustained administratively or judicially on its merits if challenged."  Tax Return Positions, Statements on Standards for Tax Services No. 1, § 5(a) (Am. Inst. of Certified Pub. Accountants 2009).  Petitioners themselves note that tax advisors must base their advice on some "realistic possibility that the position would be sustained on its merits."  Welty Letter at 1.

Therefore, the fact that the EY Tax Memo weighs the chances of success in court for certain tax positions does not indicate that the document would have been created differently absent the anticipated litigation.  Ernst & Young had an independent responsibility to engage in such legal analysis in order to advise Schaeffler on what transactional steps he should take.  In

31

other words, to give proper advice about the tax implications of the transactions, Ernst & Young

necessarily had to posit what the IRS might argue in the context of litigation and to make

judgments about who would win or lose on an issue if it were decided in a court.  Thus, it is not

surprising that the EY Tax Memo contains phrases such as "the [IRS] may argue that" or "if the

IRS were to assert."  See id. at 4.  But the mere fact that such phrases are used in a document

does not mean that the same document would not have been created absent the anticipation of

litigation.  The Court has examined language of this type as used in the EY Tax Memo and has

found no instance in which such phrases indicate that the authors are describing any particular

anticipated litigation.  Rather, these phrases are used in the same manner as they would be used

in any memorandum rendering legal advice.

   Thus, we conclude that had Schaeffler's tax advisors been asked to opine on the legal

implications of the transactions with the knowledge that an audit or litigation would not occur,

they "would have" used the same methodology to render tax advice: that is, a close analysis of

the relevant legal authorities to determine how various tax positions would be tested in the

crucible of litigation.

   For these reasons, we find that the EY Tax Memo, as well as the related responsive

documents, would have been produced in the same form irrespective of any concern about

litigation.  Accordingly, these documents are not protected from disclosure under the work

product doctrine.

III.    <u>CONCLUSION</u>

For the foregoing reasons, we deny the petition to quash.[4]

SO ORDERED.

Dated:  May 28, 2014
        New York, New York

_____
GABRIEL W. GORENSTEIN
United States Magistrate Judge

---

[4] Petitioners have sent a letter to the Court requesting a "hearing" on their petition, citing as authority 26 U.S.C. § 7604.  <u>See</u> Letter Request for Hearing, dated Apr. 22, 2014 (Docket # 46).  That request is denied because this action is not a petition to enforce a summons, which is governed by 26 U.S.C. § 7604.  Rather, it is a petition to quash, which is governed by a different provision, 26 U.S.C. § 7609(b)(2), as petitioners' own pleading recognizes.  <u>See</u> Am. Pet. ¶ 5.  In any event, petitioners have not made any showing suggesting that a hearing is required.  <u>See</u> <u>U.S. v. Noall</u>, 587 F.2d 123, 127 (2d Cir. 1978) (hearing under section 7604 not required where taxpayer "could have proffered appropriate affidavits"); <u>U.S. v. Morgan Guaranty Trust Co.</u>, 572 F.2d 36, 42 (2d Cir. 1978) (no hearing required where "petitioners made no showing sufficient to call for an evidentiary hearing"); <u>see also</u> <u>U.S. v. Tiffany Fine Arts, Inc.</u>, 718 F.2d 7, 14 (2d Cir. 1983) ("Unless a taxpayer opposing enforcement of a summons makes a substantial preliminary showing of an alleged abuse, neither an evidentiary hearing nor limited discovery need be ordered by the district court.") (citation and internal quotation marks omitted).

III.   CONCLUSION

For the foregoing reasons, we deny the petition to quash.[4]

SO ORDERED.

Dated: May 28, 2014
       New York, New York

GABRIEL W. GORENSTEIN
United States Magistrate Judge

_____

[4] Petitioners have sent a letter to the Court requesting a "hearing" on their petition, citing as authority 26 U.S.C. § 7604.  See Letter Request for Hearing, dated Apr. 22, 2014 (Docket # 46).  That request is denied because this action is not a petition to enforce a summons, which is governed by 26 U.S.C. § 7604.  Rather, it is a petition to quash, which is governed by a different provision, 26 U.S.C. § 7609(b)(2), as petitioners' own pleading recognizes.  See Am. Pet. ¶ 5.  In any event, petitioners have not made any showing suggesting that a hearing is required.  See U.S. v. Noall, 587 F.2d 123, 127 (2d Cir. 1978) (hearing under section 7604 not required where taxpayer "could have proffered appropriate affidavits"); U.S. v. Morgan Guaranty Trust Co., 572 F.2d 36, 42 (2d Cir. 1978) (no hearing required where "petitioners made no showing sufficient to call for an evidentiary hearing"); see also U.S. v. Tiffany Fine Arts, Inc., 718 F.2d 7, 14 (2d Cir. 1983) ("Unless a taxpayer opposing enforcement of a summons makes a substantial preliminary showing of an alleged abuse, neither an evidentiary hearing nor limited discovery need be ordered by the district court.") (citation and internal quotation marks omitted).

33